**In re Valerie KARBER, Debtor.**

**Bankruptcy No. 281–00132.**

United States Bankruptcy Court,
N.D. Texas,
Amarillo Division.

Jan. 15, 1982.

Timothy Kline, Linn, Helms, Kirk & Burkett, Oklahoma City, Okl., for Valerie Karber, debtor.

Otis C. Shearer, Lemon, Close, Shearer & Ehrlich, Booker, Tex., for petitioning creditors TEMCO, Lemon Ins. Agency, and First State Bank & Trust Co. of Booker, Texas.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

Petitioners, Tom McGee conducting business under the common name and style of TEMCO, Lemon Insurance Agency, and First State Bank and Trust Company of Booker, Texas ("Bank"), filed petition for involuntary order for relief against Valerie Karber pursuant to 11 U.S.C. § 303.

Alternative theories of entitlement to relief are presented. The petitioners jointly contend that they are creditors of the community estate of Valerie Karber and her husband, Braden Jay Karber, that Braden Jay Karber has been discharged in bankruptcy, and that Valerie Karber has not been generally paying those community debts for which also she is liable. In the alternative, the Bank contends that if Valerie Karber cannot be charged with the community debts she is indebted to the Bank on unpaid notes which she signed and delivered to the Bank. Also, the Bank con-tends that Valerie Karber has made undisclosed transfers of property without paying debts for which she is liable and, because it has no adequate relief in the state courts, Valerie Karber should be declared bankrupt involuntarily.

Nonjury trial was conducted on December 17, 1981. The following summary constitutes the findings of fact required by Rule 752.

The date of the marriage between Valerie Karber and Braden Jay Karber was never fixed by the evidence. It is uncontroverted, however, that prior to the marriage Valerie Karber owned substantial assets, including an apartment complex in Woodward, Oklahoma. She continued to operate the apartment complex after her marriage and her husband, Braden Jay Karber, did not participate in any manner in that operation.

In 1976, after the marriage, an opportunity arose for Braden Jay Karber to purchase Ochiltree Equipment Company in Ochiltree County, Texas. Valerie Karber assisted in that acquisition by investing $85,000.00 of her separate funds and, until she was seriously injured in an explosion at her home on April 30, 1977, she served as the bookkeeper of that business. Braden Jay Karber managed the business. No evidence was adduced which reflects that Ochiltree Equipment Company, an implement business, was anything other than a business enterprise of the community of Braden Jay Karber and Valerie Karber.

In 1978 Braden Jay Karber acquired another business enterprise which he operated under the name and style of "Johnnie's Oilfield Service." It was this venture which incurred the debts of the petitioning creditors in this case. Unlike the implement business to which Valerie Karber had willingly contributed her time and funds she adamantly opposed the acquisition of that new business enterprise. Notwithstanding her objections Braden Jay Karber made financial arrangements for the acquisition of the business with First State Bank and Trust Company of Booker, Texas, and with the First National Bank of Bartles-

ville, Oklahoma, with which the Booker Bank had a "strong relationship."

In the ensuing months the oilfield service business required operating monies. Valerie Karber did co-sign some, but not all,[1] of the notes of Johnnie's Oilfield Service to the Bank. However, she refused the Bank's demand that she secure the notes with a lien against her Woodward, Oklahoma, apartment complex and she refused to sign a personal guaranty of the notes to the Bank.

Johnnie's Oilfield Service was not a profitable operation. On March 31, 1980, Braden Jay Karber filed a voluntary petition in bankruptcy. *In Re Braden Jay Karber, d/b/a Karber Farms, Johnnie's Oilfield Service, and Ochiltree Equipment Company, Debtor,* Case No. 280–00039 (Bkrtcy., N.D. Tex., Amarillo Division 1980). All creditors with community claims against the farms, the implement company and the oilfield service company, including the three petitioners herein, were scheduled as creditors in his case. His schedules reflected $85,360.00 in general unsecured debts, $7,683.00 in priority unsecured debts and $908,743.00 in secured debts.

No challenge to discharge of Braden Jay Karber under 11 U.S.C. § 727 and no exceptions to discharge under § 523 were filed by any party in interest. On August 7, 1980, an order of discharge was entered in Braden Jay Karber's case.

Approximately one month after Braden Jay Karber filed the petition in bankruptcy the Bank filed suit in Lipscomb County, Texas, against Valerie Karber on her notes. She defended on a number of bases, including, among others, the contention that there was no consideration for her execution of the notes.

In June, 1980, two months after the Bank filed suit against her, Valerie Karber sold the apartment complex in Woodward, Oklahoma for the gross sum of $485,000.00. From the proceeds of sale she liquidated approximately $225,000.00 in notes secured by liens against the Woodward apartments, she paid all of the creditors of the apartment operation, she paid over $100,000.00 to Internal Revenue Service, and she netted approximately $141,000.00, the disposition and whereabouts thereof being undisclosed. She paid no money whatsoever to the Bank, and, with one exception[2], she paid none of the creditors of the community enterprises.

When the cognizant officials of the Bank discovered that Valerie Karber had sold her separate property, paid no monies to the Bank, and refused to disclose to the Bank officers the disposition made by her of the net proceeds of $141,000.00, the instant petition for involuntary order for relief was filed.

First, all three petitioning creditors argue that Valerie Karber's separate property should be subject to all of the community debts, citing as authority the opinion of the Texas Supreme Court in *Cockerham v. Cockerham,* 527 S.W.2d 162 (Tex.1975). In that case the wife, during a time of marital discord, opened a dress shop which she operated while the husband operated a dairy business. The dress shop business was a total failure, resulting in bankruptcy being filed by the wife. The trustee in bankruptcy attempted to hold the husband's separate property liable for the dress shop debts, arguing that the dress shop debts are joint liabilities for which both spouses are liable. The Supreme Court sharply split on the issue, but the majority opinion noted:

1. During the existence of Johnnie's Oilfield Service Braden Jay Karber signed 10 notes to First State Bank and Trust Company, totalling $400,-262.84 and 3 notes to First National Bank of Bartlesville totalling $214,000.00. Valerie Karber co-signed 4 of the notes to First State Bank and Trust Company, totalling $189,170.64 and on which is claimed to be owed a balance of $75,346.31. In addition she co-signed all three of the notes to the First National Bank of Bartlesville, upon which is claimed to be owed a balance of $97,596.58. First State Bank and Trust Company has alleged that it was required to pay the Bartlesville Bank, pursuant to its agreement with that Bank, and now holds those notes.

2. She did pay approximately $245.00 to a plumber, who refused to perform emergency plumbing at her home until the old business plumbing debt was paid.

The fact of physical operation of a business is not wholly determinative of the character, as sole or joint, of the debts incurred in its operation. This is especially true since both husband and wife now have full capacity to contract. § 4.03 Family Code.

To determine whether a debt is only that of the contracting party or if it is instead that of both the husband and wife, it is necessary to examine the totality of the circumstances in which the debt arose. Of particular importance in the instant case is the consideration of implied assent to the debt by the noncontracting party, the husband.

The debts in the instant case arose, of course, during marriage. It is well established that debts contracted during marriage are presumed to be on the credit of the community and thus are joint community obligations, unless it is shown the creditor agreed to look solely to the separate estate of the contracting spouse for satisfaction. (cases cited) There is no evidence the parties who extended Dorothy Cockerham credit agreed to look solely to her separate estate for satisfaction, and thus, there are no facts to rebut the presumption these debts are community liabilities. *Though this would establish the community character of the debts, the fact that the debts are community liabilities would not, without more, necessarily lead to the conclusion they are joint liabilities. Characterization of the debts as community liabilities is only one aspect of the circumstances to be considered in determining whether the debts are joint.* (Emphasis added)

In this case, as in *Cockerham,* the debts arose during marriage and there is no evidence that the parties who extended Braden Jay Karber credit agreed to look solely to his separate estate. Thus the community character of the debts is established. The effect of § 524 of the Bankruptcy Code on those debts must be considered.

The granting of the discharge to Braden Jay Karber in August, 1980, effectively discharged the community claims pending in that case, including the claims of each of the three petitioning creditors in this case. The discharge was effective against the community creditors of Valerie Karber as well as against the community creditors of Braden Jay Karber. 11 U.S.C. § 524(a)(3). Note the following comment from the legislative history of § 524(a)(3), reported in House Report No. 95–595, 95th Congress, 1st Session (1977) 365–6 and Senate Report No. 95–989, 95th Congress, 2nd Session (1978) 80, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5866, 6321:

> "Subsection (a) also codifies the split discharge for debtors in community property states. If community property was in the estate and community claims were discharged, the discharge is effective against community creditors of the non-debtor spouse as well as of the debtor spouse."

■ § 524(a)(3) treats the effect on the nondebtor spouse of a discharge of a debtor in a community property state when the nondebtor spouse is liable on the community claim, but has not filed a bankruptcy petition. That is, if one spouse in a community property state has commenced a bankruptcy case where, as here, no claim is excepted from the debtor's discharge and is not otherwise found to be nondischargeable, and if the nondebtor spouse would not have had a claim excepted from her discharge in a hypothetical case commenced on the same day as the commencement of the debtor's case, then the creditors of either spouse holding community claims on the date of bankruptcy are thereafter barred from asserting claims against after acquired community property. It was the duty of the scheduled creditors in the Braden Jay Karber bankruptcy proceedings to object to the hypothetical discharge of Valerie Karber, as the nondebtor spouse, within the same time limits as their objections to the discharge of Braden Jay Karber. 11 U.S.C. § 524(b). No such objections were filed and thus all community creditors before the Court in that case are now barred from seeking to collect their deficiencies from the after acquired community property of either Braden Jay Karber or Valerie Karber.

Furthermore, at least one authority has concluded that, in community property states, entities holding claims against one spouse should not have standing to file an involuntary petition against the other spouse, even though those entities will have "creditor" status in relation to the alleged debtor upon entry of the order for relief because they hold "community claims." Collier on Bankruptcy, 15th Ed. (1981) § 303.05 at 303–18. That authority continues:

"An argument can be made that standing does exist because the term 'claim against the debtor' includes claim against the debtor's property. See § 102(2) of the Code. It should be noted, however, that § 303(b) of the Code requires the petitioning creditors to have a claim against *the person,* not a claim against the debtor; therefore, § 102(2) should not apply. It would appear to be contrary to the intent of the Code provisions to allow an entity to obtain standing by first filing an involuntary petition and then claiming the status of a holder of a claim against the debtor. To allow creditors of one spouse to file involuntary bankruptcy petitions against the other spouse, moreover, would complicate the distribution scheme contemplated by § 726(c)(2)(D). If by filing an involuntary petition in bankruptcy the creditors of one spouse could reach the separate property of the other spouse, the undesirable bankruptcy incentive that Professor Riesenfeld cautioned Congress about in his testimony before the House Judiciary Committee would become a reality. See Hearings on H.R. 31 & 32 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Congress, 2nd Session 1530 (1976)."

§ 524(a)(3) does not specifically deal with the issue as to whether the discharged creditors can now proceed against Valerie Karber's separate property. That issue is the second part of the *Cockerham* analysis— that is, whether those community debts are joint debts which renders Valerie Karber's separate property liable.

In *Cockerham* the Supreme Court found adequate action on the part of the husband to find that he had impliedly assented to the debts by the wife and thus concluded that he was jointly liable. The Court noted that the husband had advanced the wife the necessary capital to pay for the initial inventory of the store, he had permitted the wife to write checks on his personal bank account and she often paid for merchandise for the store in that manner, on one occasion he borrowed $5,000.00 to pay some of the dress shop debts because, in his words, "... I have always paid my debts." On one occasion he signed a check in the sum of $1,400.00 which was used to pay operational expenses of the dress shop. Also, on the joint income tax returns of the wife and husband in *Cockerham* the parties took depreciation deductions on the dress shop equipment and wrote off substantial losses from the dress shop operation, resulting in payment of very little, if any, federal income taxes.

In the instant case the evidence does not mandate the conclusion that Valerie Karber impliedly assented to the debts of Johnnie's Oilfield Service. She testified concerning her adamant opposition to the acquisition of that new business. In her words, "at that time in our marriage Braden told me what to do, he didn't ask me to do it." She reluctantly signed some of the notes to the Bank upon the insistence of her husband, but she consistently refused to encumber her separate estate. On one occasion she countermanded her husband's instructions to her attorney to prepare necessary lien documents which would furnish the Bank a mortgage against the property. On another occasion she refused to sign a personal guaranty of the Bank's debts which her husband had caused to be prepared and had brought to her.

It is true that on one occasion in 1979, when the oilfield service operation could not make its payroll, she used funds from her bank account to pay the wage of four employees. Those funds were revenue from her separate property and were their community property over which she had the

sole management, control and disposition. Family Code § 5.22(a)(2). She did not pay those wages from her separate property.

Also, as indicated above, she had paid a plumbing bill which the oilfield service company had incurred. That payment was from either the account over which she had sole management under Family Code § 5.22(a)(2) or could possibly have been from the proceeds of sale of her separate property. In any event the plumber refused to perform emergency plumbing repairs until his old debt was paid and she had little alternative but to pay that $245.00 discharged debt. That relatively insignificant payment, without more, would not constitute the requisite implied consent to make her jointly liable on the oilfield service company's debts.

The petitioning creditors insist that "more" exists. They point to the fact that she had used $85,000.00 of her separate funds in assisting in the acquisition of the implement business in 1976; also, that she and her husband had filed joint income tax return and some of the income tax liability accruing from her separate operation of the apartment complex in Woodward, Oklahoma, was setoff with the losses and depreciation from the community operations.

As indicated above, the revenue from the apartment operation was community property which was subject to her sole management under Texas law. Nonetheless, it was community property. It was the community estate and not the separate estate of Valerie Karber which benefitted from the tax advantage.

I am not persuaded that the $85,000.00 investment in the implement business in 1976—a business venture which she expressly approved—is evidentiary that she impliedly assented to the debts of the later acquired oilfield service company—a venture of which she expressly disapproved.

Under the facts of this case I cannot find that Valerie Karber impliedly assented to the debts of the petitioning creditors. Those debts are not her joint debts which would render her separate estate liable.

■ The creditors who made appearances at the Braden Jay Karber bankruptcy proceedings and whose claims were solely community in nature were enjoined by the entry of discharge in that case from thereafter proceeding against Valerie Karber. It is undisputed that the claims of the Lemon Insurance Agency and Tom McGee, d/b/a TEMCO were claims of that nature. Without reaching the issue at this point it is probable that the claim of the Bank does not fall into that category, because Valerie Karber executed the notes to the Bank, possibly rendering herself personally liable apart from the liability of her husband. In any event, because at least two of the three petitioning creditors are in reality no longer creditors of Valerie Karber the alternate argument for "one creditor" bankruptcy must be analyzed.

After the community claims have been excepted it is apparent that Valerie Karber has no debts other than her liability, if any, on the notes to the Bank. All of the creditors of the apartment operation were paid when the apartment complex was sold. She has continued to pay all debts which have arisen in the due course of household operation as they become due. It is clear, therefore, that she is generally paying all of her debts, excepting only the debt of the Bank.

She claims that the debt to the Bank is subject to a bona fide dispute. There is persuasive authority that where a debtor fails to pay a debt that is subject to a bona fide dispute that debt should not be considered one which is not being paid as it becomes due for the § 303 analysis. *In Re All Media Properties and Art Light Broadcasting Company,* 5 B.R. 126, 2 C.B.C.2d 449 (Bkrtcy.S.D.Tex.1980), affirmed per curiam on the basis of the memorandum opinion of the bankruptcy judge, 646 F.2d 193 (5th Cir.1981).

The Bank contends that the opinion of the Court of Appeals for the Seventh Circuit *In Matter of Covey,* 7th Cir.1981, 650 F.2d 877 mandates that the contested claim be counted in the "generally paying debts" determination and since the Bank's debt is

the only one in existence the order should issue. The Court in *Covey* concluded that the Bankruptcy Courts should initially examine the dispute and balance the interest of creditors and debtors with regard to the Code's specific goal of prompt resolution of the initial involuntary bankruptcy determination. That Court concluded, also, that disputed debts should be excluded from the "generally paying debts" determination only under the following circumstances:

1. The dispute is whether any claim exists, not merely regarding the amount of a claim;

2. The dispute can be examined without substantial litigation of legal or factual questions; and

3. The debtor's interest in defeating an order of involuntary bankruptcy outweighs the creditors in achieving a somewhat more rapid determination of the involuntary bankruptcy question.

The first and third of those circumstances must be answered in the affirmative. The dispute is whether any claim in fact exists, not merely regarding the amount of the claim. However, even if only the *amount* of the claim is involved the ends of justice mandate that a conclusion be reached that the debtor's interest in defeating an order of involuntary bankruptcy outweighs that of the creditor in achieving an arguably more rapid determination of the involuntary bankruptcy question. The "more rapid determination" argument is suspect and the Bank does have adequate remedies. It had initiated an action against the debtor in the county of residence of Valerie Karber and that of the domicile of the Bank. That forum is located at a point which is of considerable distance from any place where this Court sits and is very convenient to the parties and to the witnesses who will be required to resolve the issues. That the parties can obtain a prompt resolution in that forum is evidenced by the fact that the case has already been called for trial, but was continued on the instance of one party.

The Bank contends, further, that Valerie Karber has converted assets to cash, that she has secreted those assets, and that that fact alone should justify the conclusion that the debtor is generally not paying her debts as they become due, citing *In Re Reed*, 11 B.R. 755, 4 C.B.C.2d 934 (S.D.W.Va.1981). However, the state law affords the Bank substantially the same remedies which it would have in the bankruptcy court. If it contends that the sale of the apartment complex was made to delay or hinder or defraud the Bank such fraudulent transfers may be set aside pursuant to state law. If it seeks only to discover the whereabouts of the net proceeds of sale state law provides for discovery in aid of judgment. The inquiry in that type proceeding in state court is almost identical with relevant inquiry concerning assets in the Bankruptcy Court. I perceive nothing which would encourage a litigant to be more truthful in a federal court proceeding than in a state court proceeding.

There are adequate remedies available to the Bank in the state court proceeding and the issues can be as promptly resolved in that forum.

It is, therefore, ORDERED by the Court that the complaint for involuntary order for relief under § 303 filed by First State Bank and Trust Company of Booker, Texas, Lemon Insurance Agency and Tom McGee against Valerie Karber, be, and it is hereby, denied and dismissed without prejudice.

All relief not herein granted is denied.

The Clerk is directed to file this order and to furnish a copy of the order to each attorney of record.