**In re Larry TARLETZ, Alleged Debtor.**

**Bankruptcy No. 82 B 06008 C.**

United States Bankruptcy Court,
D. Colorado.

Feb. 23, 1983.

Matthew D. Skeen and Neil E. Ayervais, Denver, Colo., for Larry Tarletz.

Gordon W. Williams, Denver, Colo., for Sportcaster Co., Inc.

Craig A. Christensen, Denver, Colo., for Imports Intern. Sales.

Paul D. Rubner, Denver, Colo., for Slalom Skiwear, Inc.

Harry M. Sterling, Denver, Colo., for Intercontinental Financial Services, Inc.

## ORDER DISMISSING CREDITORS' PETITION

PATRICIA ANN CLARK, Bankruptcy Judge.

An involuntary petition was filed against Larry Tarletz (Tarletz) on December 29, 1982 by three creditors, Imports International Sales (Imports International), Sportcaster Company, Inc. (Sportcaster) and Slalom Skiwear, Inc. (Slalom). The petitioners allege that they are owed various sums of money by Keyport Summit, Inc., and that all of these obligations were personally guaranteed by Tarletz. The petition claims that Tarletz is generally not paying his debts as they become due and prays that the Court enter an order for relief against him pursuant to 11 U.S.C. § 303. Salomon/North America, Inc. (Salomon N/A) also filed an application to be joined as a petitioning creditor but later was allowed to withdraw.

Tarletz answered and moved to dismiss the involuntary petition on the grounds that the petitioners had assigned their claims to Intercontinental Financial Services, Inc. (IFS) and, therefore, did not qualify as petitioning creditors and further that he has been regularly paying all his legitimate debts as they become due. Tarletz also counterclaimed for damages asserting that the petition was filed to pressure him to pay the disputed claims of the petitioners and accordingly was filed in bad faith. Subsequently, IFS filed an application to join in the petition asserting that the petitioning creditors held claims against Tarletz and that they had been assigned to it for collection purposes only. In the alternative, IFS stated that if it were held to be a transferee of the petitioners' claims, then it joined in the involuntary petition. A hearing was held on all matters, except the claims for damages, on February 17, 1983.

The facts are as follows. Tarletz was the president of a corporation called Keyport Summit, Inc. Keyport operated a retail ski clothing and ski equipment rental business in Breckenridge, Colorado. Breckenridge is a ski resort community. Due to a lack of snow, the winter of 1980–81 created extreme financial hardship on the Colorado ski industry and those businesses dependent upon it. Tarletz' business was no exception. The lack of snow and Mr. Tarletz' decision prior to the ski season to triple his operation created financial difficulties and Keyport became unable to pay its suppliers. On May 12, 1981 Tarletz, as president of Keyport, signed a petition seeking relief under Chapter 11 of the Bankruptcy Code. Tarletz' efforts to operate as a debtor-in-possession were unsuccessful and on May 21, 1982 he consented to the United States Trustee's motion to appoint a trustee to operate the business. Subsequently, the trustee moved to convert the proceeding to a Chapter 7, which was done on February 3, 1983. The amount of the dividend to creditors from the Keyport estate is not known but the creditors testifying at the hearing on February 17, 1983 anticipate that it may be approximately 60 percent.

Tarletz personally guaranteed the claims of the petitioning creditors and others against Keyport. Rather than wait for the distribution from the Keyport estate and then claim the difference from Tarletz, the petitioning creditors, through IFS, their collection agency, brought suit against Tarletz in the District Court in and for the County of Summit, State of Colorado, on October 12, 1982 on the personal guarantees and promissory notes executed by him for the obligations of Keyport. The petitioning creditors were advised by one David Whizen, an employee of IFS, that it would be approximately 12 to 15 months before the Summit County action would come to trial. Accordingly, on December 29, 1983 they filed the instant involuntary petition against Tarletz.

Pursuant to Section 303(b) of the Bankruptcy Code, 11 U.S.C. § 303(b), an involuntary case may be commenced by the filing of a petition under Chapter 7 of Title 11

by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

In the Summit County action, IFS alleged that it was the assignee of the petitioning creditors' claims. Because of this inaccurate statement, it initially appeared that Imports International, Sportcaster and Slalom Skiwear had assigned their claims to IFS and, therefore, did not qualify under Section 303(b) of the Bankruptcy Code. The testimony at the hearing established that the assignment to IFS was for collection purposes only and, consequently, the petitioning creditors were in fact the holders of a claim against Tarletz.

· Only holders of claims that are contingent as to liability are denied the right to be petitioning creditors under Section 303(b). Contingent claims were defined in *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bkrtcy.S.D.Tex.1980):

A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created. On the other hand, if a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to being avoided by some future event or occurrence, the claim is not contingent as to liability, although it may be disputed as to liability for various reasons . . . .

Based on the personal guarantees of Tarletz arising from obligations of Keyport, it is clear that the debts due the petitioning creditors, although disputed, are not contingent. Since the claims of Imports International, Sportcaster and Slalom Skiwear are noncontingent and exceed $5,000 in the aggregate, they are qualified to be petitioning creditors under 11 U.S.C. § 303(b).

Subsection (h) of Section 303 sets forth the standard for an order for relief on an involuntary petition. 11 U.S.C. § 303(h) provides in part:

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
(1) the debtor is generally not paying such debtor's debts as such debts become due; or . . . .

The phrase "the debtor is generally not paying such debtor's debts as such debts become due" is not defined in the Bankruptcy Code and the legislative history on this point is not helpful. One authority on bankruptcy has commented on the phrase as follows:

Although the precise scope and meaning assigned to the term "generally not paying" are left to the courts, it is clear that a court must find more than a prospective inability by the debtor to pay only a few of his debts, and more than a past failure to pay a few liabilities. It is doubtless intended that a court should properly consider both the number and amount of debts in determining whether failure to pay is, in fact, "general." 2 *Collier on Bankruptcy,* § 303.12[1] at 303–48 (15 ed.), citing to *Report of the Commission of the Bankruptcy Law of the United States,* Part II at 75 (1973)

It thus appears that the term "generally" was not defined to avoid the imposition of a mechanical test and to give the Bankruptcy Court enough flexibility to deal with the myriad situations that will arise. The cases disclose that the courts have used four factors in determining whether a debtor is generally not paying his debts: the number of debts, the amount of delinquency, the materiality of nonpayment and the nature of the debtor's conduct of his financial affairs. *In re Reed,* 11 B.R. 755 (Bkrtcy.S.D. W.Va.1981).

The first two factors require a consideration of the number of debts not paid compared to the number paid. Then the amount of the debts, separately and in the aggregate, must be examined and these should be viewed in the context of the debtor's liquidity. The Court should also consider the third factor, materiality of nonpayment of debts.

[A] default of short duration should be viewed differently than one which is longer .... Further, the debts should be examined to determine whether there is a reasonable basis for nonpayment. Either a bona fide dispute or commercial practice might not only explain, but in fact fully justify the debtor's failure to pay. *In re Reed, supra,* at 760.

This third factor was elaborated on by the Circuit Court in *In Matter of Covey,* 650 F.2d 877 (7th Cir.1981). The debtor contended that "disputed" debts should not be included in determining whether the debtors were generally not paying their debts. The Court determined that policy considerations do not support a rule of including or excluding disputed debts from the "generally paying debts" calculation. The court in *Covey* fashioned the following test:

Thus, disputed debts should be excluded from the "generally paying debts" determination only under the following circumstances: 1) the dispute is whether any claim exists, not merely regarding the amount of a claim; 2) the dispute can be examined without substantial litigation of legal or factual issues; and 3) the interests of the debtor in defeating an order of involuntary bankruptcy outweigh creditors' interests in achieving a somewhat more rapid determination of the involuntary bankruptcy question. *Id.* at 883–884.

If the debtor's interests in avoiding the involuntary bankruptcy outweigh the creditors' interest in a more rapid decision, then the bankruptcy courts should reach the "dispute" issue. If the debtor does establish that the entire debt is barred or otherwise invalid, then the disputed debt should be excluded from the "generally paying debts" calculation. *Id.* at 883.

The foregoing three factors of number, amount and materiality of nonpayment must be considered in the context of the fourth factor, which is the debtor's handling of his financial affairs.

If the debtor is winding up his business or personal affairs, selling assets in a liquidating fashion, paying only nondischargeable or co-obligor debts, kiting checks, or otherwise is conducting his financial affairs in a manner not consistent with one operating in good faith and in the regular course of business, then the interpretation of nonpayment could be quite different. *In re Reed, supra,* at 760.

■ The Court must now apply these standards to Tarletz' situation to determine if he is generally not paying his debts as they become due. The petitioning creditors contend that, in addition to the debts due them, Tarletz is not paying debts due Look Sports, Inc. (Look), Salomon N/A, Top Notch Knits, and Judd Missner (Missner). Each one of these alleged obligations will be examined.

Slalom Skiwear claims that Tarletz owes it $20,000 under a personal guarantee signed by him for the obligations of Keyport. Although Slalom Skiwear never made demand on Tarletz personally before the Summit County lawsuit, this is immaterial to the issue of whether the debt is due. *In re All Media Properties, Inc., supra,* at 145. In any event, Tarletz knew in October, 1982, when the Summit County action was filed, that Slalom Skiwear was making demand on him for payment. Tarletz offered no evidence to show this debt is not due except to state that he thought they had to pursue Keyport first. This is not the case. The terms of the guarantee are clear that Slalom Skiwear can proceed against the guarantor upon default of the principal without taking any action against the principal. Keyport has defaulted and, therefore, under the terms of the guarantee, Tarletz is liable for the debt.

Imports International claims that Tarletz owes it $26,000 plus interest under his per-

sonal guarantee of all sums due on the Keyport account. Tarletz stipulated that approximately $17,000 is due Imports International. Although Tarletz did not meet his burden as set forth in *In Matter of Covey, supra,* of establishing that the amount in excess of $17,000 is barred or otherwise invalid, the Court will assume that he could and only include $17,000 in the amount of unpaid debts.

In the Summit County action, Sportcaster claimed that Tarletz owed it approximately $55,000 under a promissory note signed by him and dated May 22, 1981. At the hearing on the involuntary petition, Tarletz stipulated that he owed Sportcaster about $7,000 under a guarantee agreement dated August 7, 1979, which expired June 1, 1980. Sportcaster acknowledged that it was only owed about $7,500 under such guarantee. The second guarantee, which is dated August 7, 1980, and the promissory note dated May 22, 1981, were not signed until after the filing of the Chapter 11 petition by Keyport. The second guarantee was signed by Tarletz and back-dated to induce Sportcaster to ship additional goods to Keyport during the 1981–82 ski season. However, no goods were shipped by Sportcaster to Keyport and, therefore, the consideration for the subsequent guarantee appears to have failed. Although Keyport may owe Sportcaster approximately $55,000, it appears that Tarletz only owes them approximately $7,300, being the amount due according to their invoice before the August 7, 1979 guarantee expired on June 1, 1980.

The agent for Look claims that Tarletz owes it approximately $28,000 pursuant to his guarantee agreement for Keyport. The testimony at the hearing was inconclusive and did not establish that such sum was owing. Tarletz testified that the equipment from Look was defective and would be returned to it. Although there may be some liability to Look, the amount is unknown and will not be considered by the Court in its calculations.

Salomon N/A claims that Tarletz owes it $8,100 pursuant to his personal guarantee of the debts of Keyport. Tarletz admits that this obligation is due and has agreed to pay it if Salomon will assign its claim against Keyport to Tarletz. By this procedure, Salomon N/A would not be able to recover from both the Keyport estate and Tarletz and Tarletz would be reimbursed for his payment under the guarantee to the extent of the dividend to creditors from the Keyport estate. The delay in satisfying this obligation appears to be due to some confusion regarding who is to prepare the assignment of the Salomon N/A claim against Keyport to Tarletz. Nevertheless, this amount is due and owing and should be included in the calculations of generally not paying debts. If Tarletz were anxious to satisfy this obligation, he could have assumed the initiative for preparation of the necessary documentation.

Although the claim of Top Notch Knits for approximately $6,700 was included in the Summit County action, there was absolutely no evidence that Tarletz has any liability for this obligation. Consequently, it should not be considered.

It also appears that Tarletz owes Judd Missner approximately $5,400 under a promissory note executed by him individually and as president of Keyport. There was no explanation of why this obligation, which has been due for about two years, has not been paid.

In summary then, Tarletz owes the following debts:

| | |
|---|---:|
| Slalom Skiwear | $20,000 |
| Imports International | 17,000 |
| Sportcaster | 7,300 |
| Salomon N/A | 8,100 |
| Judd Missner | 5,400 |
| | $57,800 |

The next step is to compare the past-due indebtedness to the number and amount of new indebtedness. Tarletz owns a new business called Beaver Run Ski Enterprises, Inc., which operates a ski rental and sales business in Breckenridge, Colorado. As the owner and chief operating officer thereof, this constitutes Tarletz' major source of income. Beaver Run realized a substantial net profit last year and Tarletz expects

greater profitability this year. He estimates the value of the business to be about $1,000,000. Consequently, Beaver Run is paying its obligations on a current basis. Tarletz has numerous personal credit and charge cards which he pays on a current basis. The average monthly amount was not established. In addition, he has payments on his car mortgage, which has an unpaid balance of about $8,500. There are also the customary utility bills.

Tarletz appears to have no other obligations except for a contract to buy a house. Keyport owns the house in which Tarletz resides. Tarletz has entered into a contract to buy this property for $405,000. Between January 26, 1982 and April 1, 1982, Tarletz paid $200,000 towards the purchase price. He is entitled to a credit of approximately $100,000 for improvements to the house made from his personal assets. The balance of $105,000 is due in March, 1983. In addition to the Beaver Run business and his contract to buy the house, Tarletz has about $80,000 in the bank. He also owns household goods and an art collection which he values at between $80,000 to $100,000. Consequently, Tarletz has a substantial net worth. However, except for the cash, his assets are not readily liquid. Unless he is able to borrow the funds, he will need the $80,000 cash to complete the purchase of his house.

There was absolutely no evidence that Tarletz is winding up his business or personal affairs. On the contrary, he is operating a new business in what appears to be a successful manner and making a substantial investment in residential property.

In summary then, the situation is as follows. The number of delinquent debts is small but the amount due of $57,800 is substantial. These are not just some but all of the debts from Tarletz' former business on which he is personally liable. These obligations have all been due for approximately two years. Although these creditors will receive a partial payment on their claims from the Keyport estate, they are not required to wait for this event. Accordingly, there is no reasonable basis for

the nonpayment of these obligations by Tarletz. Although Tarletz is not liquidating his affairs, what he is doing is paying his current obligations and trying to buy his house from the Keyport estate rather than satisfying the old obligations from his former business. The purchase of the house from the Keyport estate accomplishes two things for Tarletz. First, it enables him to buy his house and second, since the sale proceeds eventually will be distributed to all the creditors of the Keyport estate, it partially satisfies the obligations on which Tarletz is personally liable. Although the Court understands Tarletz' desire to purchase his house, it nevertheless does not nullify his present liability on his personal guarantees or justify his failure to pay them. Although Tarletz may have the ability to pay his debts, this is not a factor in determining whether he is within the scope of an involuntary bankruptcy. *In Matter of 7H Land & Cattle Co.,* 6 B.R. 29 (Bkrtcy. D.Nev.1980), *In re Hill,* 5 B.R. 79 (Bkrtcy.D. Min.1980).

Considering both the number of debts past due, their amounts, the length of the default and Tarletz' disinclination to pay the nondisputed portion of these obligations, the Court finds that the petitioning creditors have met their burden of proving that Tarletz was generally not paying his debts on December 29, 1982 as those debts become due.

The decisions cited by Tarletz for rejection of the involuntary petition are inapposite. In *In re S.B.A. Factors of Miami, Inc.,* 13 B.R. 99 (Bkrtcy.S.D.Fla.1981) the Court found that there was no evidence of any debt due to the petitioning creditors or, if so, they were disputed in good faith. Failure to pay several claims disputed in good faith does not prove that the debtor is generally not paying its debts as they become due. In the instant case the evidence established that there is at least $57,800 due the petitioning creditors and others. Similarly, in *In re Nar-Jor Enterprises Corp.,* 6 B.R. 584 (Bkrtcy.S.D.Fla.1980) there was no evidence that the debtor owed any obligations except for an unliquidated sales tax obliga-

tion and the alleged debt to the petitioning creditor which involved a real, and not illusory, dispute between the parties. The Court found none of the evidence amounted to a showing that the debtor is not generally paying its obligations as they become due. Again, that is not the case here with $57,800 in past-due undisputed obligations. The case of *In Matter of 7H Land & Cattle Co., supra,* cited by Tarletz is of no help to him. In that case the court denied the alleged debtors' motions to dismiss finding that a single creditor may establish a case for involuntary bankruptcy with only proof of a default in the debt due him under certain circumstances. Tarletz' reliance on the case of *In re Karber,* 25 B.R. 9 (Bkrtcy. N.D.Tex.1982) for rejection of the petition is also misplaced. There the alleged debtor had no debts other than the asserted liability to the bank. The court in *Karber* found that the dispute between the alleged debtor and the bank was whether any claim in fact existed and was not merely a dispute involving the amount of the claim. In the instant case Tarletz does not dispute debts totaling $57,800. For cases supporting a finding that Tarletz is generally not paying his debts as they become due, *see: In re Win-Sum Sports, Inc.,* 14 B.R. 389 (Bkrtcy. D.Conn.1980); *In re Hill, supra; In re International Teledata Corporation,* 12 B.R. 879 (Bkrtcy.D.Nev.1981); *In re Donald D. Bowers,* 16 B.R. 298 (Bkrtcy.D.Conn.1981); *In re B.D. International Discount Corp.,* 15 B.R. 755 (Bkrtcy.S.D.N.Y.1981).

Even though the basis for an involuntary case has been established, it must be determined whether an order for relief should be entered or the case should be dismissed under 11 U.S.C. § 305.[1] Section 305 provides that the Court may dismiss a case under Title 11 if the interests of creditors and the debtor would be better served by such dismissal. The legislative history states that the court may dismiss if out-of-

court arrangements are being worked out which are not prejudicial to the creditors and the case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. House Report No. 95–595, 95th Cong., 1st Sess. (1977) 325; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 35, U.S.Code Cong. & Admin.News 1978, p. 5787. The example set forth in the legislative history is not intended to be inclusive. In considering dismissal under Section 305, it is appropriate to consider the motivation of the petitioners, whether the bankruptcy court or the state court can better serve the interests of the creditors and the detriment of the bankruptcy proceeding to the debtor.

Prior to the filing of the bankruptcy petition, none of the petitioning creditors made any effort to investigate the financial status of Tarletz, his normal payment practices or whether his debts were generally being paid as they became due. All they knew was that their obligations were not being paid. Their primary reason for initiating the petition was to obtain a more rapid determination of their dispute with Tarletz than they believed possible in the state court action. David Whizin of the collection agency, IFS, advised the petitioning creditors that the state court action would take 12 to 15 months to come to trial and recommended to them that they file the involuntary bankruptcy petition. By such action Mr. Whizen believed that Tarletz would decide to cooperate and bring the matter to a resolution. Mr. Whizen has on numerous occasions in the past recommended to his clients that they file involuntary bankruptcy proceedings. He is fully cognizant of the tremendous pressure that an involuntary bankruptcy petition can have on an alleged debtor. Furthermore, IFS agreed to indemnify each of the petitioning creditors for the attorney fees of Gordon Williams and any damages they

---

1. Tarletz filed a motion to dismiss the case under 11 U.S.C. § 305. Notice was given that a hearing would be held on such motion on February 17, 1983. Subsequently, Tarletz moved to withdraw his motion preferring to have the case dismissed on its merits. The

motion to withdraw has not been granted. Furthermore, the Court has the inherent power to consider such a motion *sua sponte.* Accordingly, the question of a dismissal under Section 305 is properly before the Court.

might sustain by reason of the filing of the bankruptcy petition. The reason IFS agreed to indemnify the petitioners is because of the ongoing relationship with them plus the fact that IFS has other clients in the ski industry who, according to Mr. Whizen, would be taking a long look at the Tarletz case.

Whatever their motives, creditors are entitled to the protection afforded by the Bankruptcy Code to safeguard their rights. But it is obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this Court. *In re S.B.A. Factors of Miami, Inc., supra.* The question then becomes will the bankruptcy court or the state court better serve the interests of the creditors. None of the creditors moved for summary judgment in the state court action or attempted to get the trial date advanced on the court's calendar. Instead, they filed the bankruptcy proceeding on the assumption that it would be a more expeditious resolution of their claims. It does not appear that the bankruptcy proceeding will accomplish this desired purpose. If an order for relief is entered under Chapter 7, Tarletz has indicated that the proceeding will be converted to Chapter 11. He has the unfettered right to do this pursuant to 11 U.S.C. § 706. Under Chapter 11 a debtor has the exclusive right for 120 days to file a plan. This time period can be extended for cause under 11 U.S.C. § 1121(d). Assuming that a 60 day extension were granted, it would be six months before a plan and disclosure statement were filed. It would be 30 to 60 days thereafter before a hearing were held on the disclosure statement and approval obtained. The plan and disclosure statement would then have to be submitted to creditors. However, the hearing on confirmation might not be held for two or three months thereafter. Of course there are exigent circumstances that would warrant advancing these dates, but none appear to exist in this case. The hearing on objections to claims is normally held after confirmation. Again, the date for such hearing would be dictated by the Court's calendar, but probably would be another several months away. It is readily obvious that with all the steps which must be complied with the petitioners' claims are not going to be resolved any faster in the bankruptcy court than they would be in the state court.

Mr. Whizen and the petitioning creditors were concerned that if they had to wait 12 to 15 months for a resolution of the state court action Tarletz may not have the assets to satisfy any judgment they might obtain. However, none of them believed that he was hiding or improperly transferring any of his assets. Mr. Whizen was also concerned that one employee of Keyport was also working for Beaver Run. There was no evidence that the work done for Beaver Run was anything but minimal. The representatives of Sportcaster and Imports International both serve on the creditors' committee for Keyport. They knew, as did Mr. Whizen who was a former member of the creditors' committee, that Tarletz has made a substantial investment in his home. They also were aware of his Beaver Run business. Consequently, they knew that he is not winding up his affairs and trying to liquidate his assets. In fact, quite the opposite is occurring. Of course, it is possible, although not probable, that Tarletz may dissipate his assets. If this is a genuine concern, it is a very simple matter in Colorado to file a lis pendens against Tarletz' house. This would create a lien from which any future judgment could be satisfied. Colo.Rev.Stat. § 38–35–110 (1983). Furthermore, Colo.R.Civ.P. 102 provides a method by which the defendant's property can be attached before a judgment is entered. There are adequate remedies available to the creditors in the state court proceeding and the issues can be as promptly resolved in that forum. Accordingly, it does not appear that the bankruptcy proceeding will accomplish anything for the creditors that they cannot obtain in the state court action.

It is common knowledge that the allegations of bankruptcy have a very adverse affect on the alleged debtor's ability to obtain credit. Because of the petition Tarletz has already experienced some difficulty

with creditors in connection with his Beaver Run operations. If an order for relief were entered against Tarletz, it would be detrimental to his business and could affect his profitability. If his revenues are reduced, so too is his ability to pay creditors. Additionally, the cost of a bankruptcy proceeding is substantial, further impairing Tarletz' ability to pay his debts. Tarletz wishes to continue to do business with Salomon N/A and has agreed to pay this obligation upon assignment of its claim against Keyport to him. Therefore, this obligation should be paid in the near future. There exist genuine disputes between Tarletz and several of his creditors and he should not be compelled to pay these debts prematurely to get out from under the stigma of a bankruptcy proceeding. As to the other creditors whose claims are due, it does not appear that they will fare any better in the bankruptcy court than they will in the state court. Furthermore, the detriment to Tarletz by the bankruptcy proceeding appears to be substantial. This could have adverse ramifications for all of his creditors.

For the foregoing reasons, the petition against Tarletz should be dismissed pursuant to Section 305(a)(1) as the interests of Tarletz and his creditors will be better served by such dismissal.

ORDERED that the involuntary petition in bankruptcy filed by Imports International Sales, Sportcaster Company, Inc. and Slalom Skiwear, Inc. against Larry Tarletz on December 29, 1982 is dismissed.

FURTHER ORDERED that the parties shall have 10 days from the date this Order becomes final to file a written request for the withdrawal of all exhibits received in evidence, after which time the exhibits will be destroyed by the deputy clerk without further order of the Court.