### In re CENTRAL HOBRON ASSOCIATES, Debtor.

**Bankruptcy No. 83–00046.**

United States Bankruptcy Court, D. Hawaii.

Dec. 2, 1983.

William Dodd, Honolulu, Hawaii, for debtor.

Terry Day, Honolulu, Hawaii, for petitioning creditors.

JON J. CHINEN, Bankruptcy Judge.

On January 31, 1983, an involuntary chapter 7 case was filed against Central Hobron Associates, hereafter "CHA", by Z–R Corporation, hereafter "Z–R", Dora Kong, hereafter "Kong", and Stanley Shin, hereafter "Shin", Trustee for the Christine Shin, Jodi Shin, Michael Shin, Dean Shin Trust, hereafter collectively "Petitioners".

In the petition, Petitioners have alleged that they are creditors of CHA holding claims against it, not contingent as to liability, amounting in the aggregate of over $5,000.00 on which no liens are held. Petitioners have also alleged that CHA is generally not paying its debts as they become due as indicated by its failure to pay monthly installments of $25,000.00 to Petitioners pursuant to the terms and conditions of certain agreements between Peti-

tioners and CHA executed in December, 1980.

CHA denied the allegations in the petition, especially disputing the liability to Petitioners under the December 1980 agreements. CHA denies that, as of January 31, 1983, it was generally not paying its debts as these become due.

The issue before this Court is whether CHA, as of January 31, 1983 was generally not paying its debts as they became due. As part of said issue, there is a preliminary question as to whether this Court should include disputed debts in determining whether the "generally not paying" standard has been met.

A hearing on the petition was held on August 19, 1983, September 12, 1983, and October 14, 1983. Present at the hearings were William H. Dodd, Esq. representing CHA, and Boyce R. Brown, Esq., Terry L. Day, Esq. and Mary Blaine Durant, Esq., representing Petitioners.

Based upon the evidence adduced, the memoranda and records herein, and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

On December 12, 1980, by a certain letter agreement, hereafter "Letter Agreement", CHA agreed to purchase from Shin all of the stock of Dora Kong Corporation, which was the general partner of Waikiki Hobron Associates, hereafter "WHA" for the purchase price of $882,600.00. CHA further agreed to purchase from Z–R and Enoch Kong all of their respective limited partnership interests in WHA, for the purchase price of $418,000.00. Subsequently, at Shin's request, the agreement to purchase the stock of Dora Kong Corporation was changed to an option to purchase as set forth in the Stock Purchase Option Agreement dated December 17, 1980. This option was properly exercised and the down payment of $100,000.00 was made by CHA, in part by the cancellation of a loan which had been made by CHA to Petitioners so that Petitioners may have some funds during the option period under the Stock Purchase Agreement.

The Agreements required the payment of a total of $25,000.00 a month and payment in full upon the earliest of:

1. Repayment of any construction loan for the construction of the Waikiki Hobron Project, or

2. The sale, assignment or transfer by CHA of its interest in the Waikiki Hobron Project, or

3. April 1, 1983, or

4. The cessation of payments called for under the agreement.

In accordance with the terms of the Agreements, CHA commenced making monthly payments totalling $25,000.00 in April of 1981. Then, on September 8, 1981, a lawsuit was filed by Domain Corporation, hereafter "Domain", in the State Circuit Court against CHA, Dora Kong Corporation, Charles Pankow Associates, George Hutton, and Charles Pankow, Jr., hereafter collectively "Pankow Group", and Z–R, Kong, Clifford Shin, C. Shin—Waikiki Lodge, Inc., Hobron Lane Project, and Creative Money, Inc., hereafter "Shin Group", the case being *Domain Corporation v. Dora Kong Corporation, et al.,* Civil No. 67197. On December 12, 1982, a Crossclaim was filed by the Shin Group against the Pankow Group. On July 1, 1983, an Amended Complaint was filed by Domain. The Pankow Group has filed Answers to both the Amended Complaint and the Crossclaim. Although certain counts of the Amended Complaint have been dismissed, Civil No. 67197 is still pending against all defendants therein.

Because of the claims asserted by Domain in the Amended Complaint, CHA stopped making any further payments to Petitioners after December 1, 1981.

On March 15, 1982, CHA agreed to sell all of its interest in the Waikiki Hobron Project to SAJE Ventures II. Though closing was to take place in May 31, 1982, the transaction did not close until February 4, 1983.

As a result of CHA's failure to make the monthly payment of $25,000.00, on April 7, 1982, Z–R, Shin, and Enoch Kong filed a Complaint in the State Circuit Court against CHA, and others, for the recovery of the balance of the purchase price under the December 1980 Agreements, the case being *Z–R Corp., et al. v. Central Hobron Associates, et al.,* Civil No. 70541. In its Answer filed on September 23, 1982 CHA raised several defenses, among them being breach of contract, nonperformance of conditions precedent and various breaches of certain representations and warranties contained in the Agreements. CHA also filed a Counterclaim and a Third-Party Complaint against Petitioners and other parties, therein seeking damages resulting from various breaches of the representations and warranties. The various breaches of the representations and warranties alleged by CHA include the claim that Dora Kong Corporation and/or WHA is indebted to Kong in the amount of $152,000.00, and the claim that Kong, Clifford Shin, and C. Shin—Waikiki Lodge, Inc. are entitled to indemnification from WHA for any judgments rendered against them in Civil No. 67197.

Although Civil No. 70541 was filed on April 7, 1982, over 18 months ago, the Plaintiffs therein, who include Petitioners Z–R and Shin, have failed to prosecute same. No discovery has been performed, no depositions have been taken, and no motions have been filed.

Thereafter, on January 31, 1983 the Petitioners filed their involuntary petition against CHA. CHA acknowledges that it entered the Agreements with Petitioners in December of 1980 and that it ceased making the monthly payments of $25,000.00 after December 1, 1981. CHA contends that, because of alleged breaches of representations and warranties on the part of Petitioners, the claims of Petitioners for the monthly payments are disputed, and as such, have not been paid.

## CONCLUSIONS OF LAW

Pursuant to Section 303 of the Bankruptcy Code, three or more creditors must join in an involuntary petition unless there are less than twelve creditors, in which case a single creditor may file. The petitioning creditors must have unsecured, noncontingent claims in the aggregate amount of $5000.00. Petitioners herein are comprised of three separate creditors, Z–R, Kong and Shin, who have claims against CHA in excess of $1,200,000.00 which are unsecured and noncontingent.

If the debtor timely controverts the petition, the Court shall order relief if it determines that "the debtor is generally not paying such debts as such debts become due", section 303(h)(1). If the requirements are met, it is mandatory that the court grant relief to the creditors. *In Re Duty Free Shops Corporation,* 6 B.R. 38, (Bkrtcy.S.D. Fla.1980).

There are two issues before this Court:

1. Should the debts disputed by CHA be included in determining whether it was generally not paying its debts as such debts become due at the time of the filing of the petition?

2. Was CHA generally not paying its debts as such debts become due at the time of the filing of the petition?

I. Should the debts disputed by CHA be included in determining whether it is generally not paying its debts as such debts become due?

Where a claim is disputed, courts have arrived at different conclusions in determining whether to include such disputed claim in the calculation of debts generally not being paid. Some courts have included such disputed claim; others have declined. The facts of each particular case are controlling.

CHA contends as a matter of law that it has no obligation to pay disputed debts. However, the majority of cases on this issue decided under the Bankruptcy Code hold that, at least under certain circumstances, disputed debts may be included in the consideration of whether a debtor is generally paying its debts when they become due.

The leading case of *In re Covey*, 650 F.2d 877 (7th Cir.1981), sets out a three-stage test to determine whether a disputed debt should be included in the "generally paying debts" standard. There, the Circuit Court stated:

Thus, disputed debts should be excluded from the "generally paying debts" determination only under the following circumstances: 1) the dispute is whether any claim exists, not merely regarding the amount of a claim; 2) the dispute can be examined without substantial litigation of legal or factural questions; and 3) the interests of the debtor in defeating an order of involuntary bankruptcy outweigh creditors' interests in achieving a somewhat more rapid determination of the involuntary bankruptcy question.

In the instant case, CHA disputes the validity of the claims of Petitioners. It contends that it does not owe anything under the December 1980 agreements because of default on the part of Petitioners, to wit, among others, breach of contract, nonperformance of conditions precedent, and various breaches of representations and warranties in the Agreements. Under the first *Covey* test, this claim should not be included as part of the debts to be considered in determining whether CHA is generally not paying its debts as they become due.

Although both Civil 67197 and Civil 70541 have been pending in the State Circuit Courts for some time, neither one has yet been brought to a conclusion. To determine whether there were misrepresentations and breach of warranties on the part of Petitioners will involve substantial litigation involving factual and/or legal disputes. Thus, under the second *Covey* test, the disputed debt should be included in determining whether CHA is generally paying its debts as they become due.

Under the third test, courts have generally found that where a debtor has no ongoing business or where the debtor is disputing a large portion of its debts, there is little prejudice to it by permitting an involuntary petition to proceed, and a correspondingly greater amount of prejudice to

the creditors by delay in the bankruptcy determination. *In re Covey, supra.*

In *In re B.D. International Discount Corp.*, 15 B.R. 755 (Bkrtcy.S.D.N.Y.1981), the court stated:

While no doubt an improvidently filed involuntary petition (i.e.: by one without a valid claim) can wreak havoc on an innocent debtor, this potential harm must be juxtaposed with the need to ensure that earnest creditors promptly receive all of the rights and protections afforded by the bankruptcy laws, lest the assets of the estate be squandered and secreted away by a financially troubled or dishonest debtor. See Report of the Commission on the Bankruptcy Laws of the United States (1973) Part I at 186. Whatever solace it may provide, Congress did provide in 11 U.S.C. § 303(i) remedy for an aggrieved debtor ultimately successful in setting aside the scarlet letter of involuntary bankruptcy proceedings.

In the instant case, CHA is no longer actively engaged in business. On March 15, 1982, it entered into an agreement to sell all of its assets to SAJE Ventures II and the transaction was closed on February 4, 1983. Thus, entering an order of relief herein will not hamper the business efforts of CHA. Hence, the Court concludes that Debtor's interests do not outweigh the interests of Petitioners in an expeditious resolution of the bankruptcy question in order to avoid waste of assets.

Because CHA does not satisfy two of the three *Covey* tests, the Court finds that the disputed debts in this case should be considered in determining whether CHA is generally not paying its debts as they become due.

II. Was CHA generally not paying its debts as they become due as of January 31, 1983, the date of the involuntary petition?

The courts have formulated two methods for determining whether a debtor is generally not paying its debts as they become due and, consequently, is insolvent. The first method appears in *In re All Media Properties, Inc.*, 5 B.R. 126 (Bkrtcy.S.D.Tex.1980).

In *All Media,* the court focused on the number of unpaid creditors and the amount of unpaid debt. The second method, which is less exacting, was used by the court in *In re Hill,* 8 B.R. 779 (D.C.D.Minn.1981). The court in *In re Hill* acknowledged that the reference to the percentage of debt or the number of creditors had disappeared from the final version of Section 303(h)(1). In a situation where debtor was paying all debts with the exception of three large debts, the *Hill* court held that payment of the small debts was immaterial and that the debtor was not paying its debts in the regular course of business.

CHA's financial condition as of the date of filing the petition in this action is shown by the balance sheet which is part of CHA's 1982 tax return (P–24). That balance sheet (Schedule L to the return) shows that as of December 31, 1983, CHA had current liabilities of $5,641,534. "Statement 6" to the return details what those current liabilities consisted of:

| | |
|---|---|
| 1. Note Payable Chas. Pankow Asso. | $ 2,659,727 |
| 2. Accrued Interest Owed Chas Pankow | 1,535,792 |
| 3. Acct. Payable Dora Kong | 639,338 |
| 4. Acct. Payable Z–R Corp. | 158,733 |
| 5. Acct. Payable Enoch Kong | 176,930 |
| 6. Accrued Gross Excise Tax | 43,440 |
| 7. Deferred Income from Amts. Pd. CHA by SAJE Ventures II on the Purchase Agreement | 427,574 |
| | $ 5,641,534 |

On all of these debts, however, CHA made only these minimal payments in 1982:

| | |
|---|---|
| 1. Partnership Registration Fee | $        10 |
| 2. Accounting Fees | 9,516 |
| 3. Insurance | 1,445 |
| 4. Paydown of Note to Charles Pankow Assoc. | 186,127 |
| | $    197,198 |

The total payments made by CHA in 1982 represented less than 3.5% of its total indebtedness. If the insider payment of $186,127 to Charles Pankow Associates is disregarded, then CHA paid less than 2.0% of its debts in 1982.

■ Under the *All Media* approach, focusing on the number of unpaid creditors and amount of unpaid debt, the evidence reveals that of CHA's six major creditors, only one, the insider Charles Pankow Associates, received any payments in 1982. Petitioners received nothing in 1982. Under the *Hill* approach, as well, CHA was not paying its debts in the regular course of business. This is clearly shown as one traces the source of cash used to make the relatively few payments to creditors in 1982 by CHA.

Under the terms of the Buy-Sell Agreement, CHA agreed to sell all of its interest in the Waikiki Hobron Project to SAJE Ventures II for $4,679,623.20. By the terms of the Buy-Sell Agreement, CHA received a $100,000 down payment and if closing was delayed beyond May 21, 1982, the Agreement could be extended upon payment of extension fees. In 1982 CHA received the $100,000 plus three extension payments totalling $240,388.69. In 1982 CHA's only source of cash came from these payments.

Thus the only source of cash which CHA had to pay its debts in 1982 came as a result of its agreement to sell virtually all of its assets for $4,679,623.20, a sum which was one million dollars lower than the value assigned to those asset on CHA's balance sheet. (See P–24, Schedule L, which lists total assets as $5,609,077.) As a result, the only source of cash from which CHA could make any payments on its liabilities in 1982 came from its agreement to liquidate its assets at a figure which would be a million dollars short of meeting CHA's liabilities.

■ Paying one's debts using funds derived from an agreement to liquidate the assets of the company at a price one million dollars short of meeting the company's debts does not constitute payment of debts in the regular course of business.

The evidence further shows that historically CHA has always been insolvent. Except for the small amount of money which CHA obtained from SAJE in 1982, all other funds expended by CHA were borrowed from either its limited partners (Charles

**116**

Pankow, Jr. and George Hutton) or from Charles Pankow Associates.

Statement 4 to Schedule L to CHA's tax return for 1982 shows that CHA's primary hard asset at the beginning of the year consisted of $2,973,597 in "Construction Funds Advanced". However, a review of Statement 6 of the return to determine the source of these funds reveals that the money used to acquire the asset of "construction funds advanced" came from CHA's borrowing the money, initially from its limited partners and then from Charles Pankow Associates in the amount of $2,845,854. A company whose only payments of debts "in the regular course of business" is with borrowed cash which creates still another liability is not generally paying its debts as they become due. CHA was only shifting the liability from one creditor to another.

CHA argues that the so-called "indemnity" agreement from SAJE Ventures II will ensure payments of debts if CHA is unable to pay. CHA further argues that sums of money which it may receive sometime in the future from SAJE Ventures II will enable it to pay Petitioners any amount owed by CHA to Petitioners.

■ Such argument is without merit. Section 303(h)(1) provides that, if the petitioning creditors show that debtor is generally not paying its debts as they become due, the court must grant relief to the petitioning creditors. The fact that the debtor may be able to pay the creditors in full sometime in the future is no defense.

Based on the foregoing, the Court finds that Debtor is generally not paying its debts as they become due. The Court therefore hereby grants the order for relief.