In re CENTRAL HOBRON ASSOCI-
ATES, Debtor-Appellant,

Z–R Corporation, Dora Kong, and Stan-
ley Shin, Petitioners-Appellees.

Civ. No. 84–0285.

United States District Court,
D. Hawaii.

July 16, 1984.

William H. Dodd, Chun Kerr & Dodd, and L. Marshall Smith, Honolulu, Hawaii, for petitioners-appellees.

Boyce R. Brown, Jr., Terry L. Day, Honolulu, Hawaii, for debtor-appellant.

**OPINION AND ORDER**

PENCE, District Judge.

This concerns an appeal from an Order of involuntary liquidation under Chapter 7 of Title 11 of the United States Code. The petitioning creditors are Z–R Corporation, Dora Kong, and Stanley Shin. Petitioners filed their creditors' petition seeking entry of an order for relief in the bankruptcy court on January 31, 1983.[1] Underlying the involuntary petition was a dispute between the three petitioners and Central Hobron Associates (CHA) over the performance of a complex real estate sales transaction in which CHA was the buyer and Kong, Z–R Corporation, and Shin were the sellers. (The sellers were referred to as "the Kong family" in the sales documents, but throughout this litigation they have been called "the Shin Group," presumably because they all used Clifford Shin as their spokesman; this court will also refer to them as the Shin Group.)

The transaction between CHA and the Shin Group, formalized in a Letter Agreement dated December 12, 1980 and in a Stock Option Purchase Agreement dated December 17, 1980, was for the sale of the Kong family interests in the Waikiki Hobron condominium project. The "Kong family interests" referred to 1) all the stock of the Dora Kong Corporation, which was the general partner of an entity called Waikiki Hobron Associates ("WHA") (of which Clifford Shin was the president); 2) the interest of Enoch Kong as a limited partner in WHA; and 3) the interest of Z–R Corporation (of which Clifford Shin was also the president) as a limited partner in WHA. The December 12, 1980 letter agreement provided that the total purchase price for the Kong family interests was $1,300,000, and monthly payments by CHA were to be $25,000. The purchase price and the amount of monthly payments were broken down into three parts reflecting the

---

1. The parties to this appeal have been engaged in various disputes and transactions over the last four years. There have therefore arisen many complex facts. Only those facts relevant to this appeal are included in the following history of how the involuntary petition came to be filed.

sale of the three interests (i.e., Dora Kong Corp., Z–R Corp., and Enoch Kong). After the letter agreement was signed, tax considerations motivated Clifford Shin to request that the agreement concerning the Dora Kong Corp. stock be transformed into a Stock Option Purchase Agreement. This change of form was agreed to,[2] and a Stock Option Purchase Agreement was executed on December 17, 1980. This Agreement recited that it was between Stanley Shin (as trustee for four minor Shin children) and Central Hobron Associates, for an option to purchase the stock of Dora Kong Corporation.

Almost immediately after the agreements were executed, CHA and the Shin Group began having disputes over various details of the agreements. Despite these disputes, CHA made the payments of $25,000 per month, as required, from April 1981 through December 1981. CHA's decision to stop making payments after December 1, 1981 stemmed from a lawsuit that was filed against it and the Shin Group in Hawaii state court by an entity called the Domain Corporation on September 8, 1981. As a result of claims asserted in the Domain action, including various cross-claims filed therein, CHA disputes the validity of its obligations to the Shin Group under the Letter Agreement and the Stock Option Purchase Agreement.

On April 7, 1982, after CHA stopped making the payments called for in the agreements, the Shin Group brought suit in Hawaii state court (Civil No. 70541) seeking the balance allegedly due under the agreements. CHA raised affirmative defenses, including breach of contract, nonperformance of conditions precedent, and breaches of representations and warranties, and also filed a counterclaim and a third-party complaint. As of December 5, 1983, when the bankruptcy court entered its order for relief, Civil No. 70541 had

been pending for over 18 months and the Shin Group plaintiffs had failed to prosecute the action. The bankruptcy court noted in its order that "no discovery has been performed, no depositions have been taken, and no motions have been filed." Findings of Fact, Conclusions of Law, and Orders for Relief, entered December 5, 1983, at 5. On November 15, 1983, the Shin Group filed a second suit in state court alleging fraudulent transfers and seeking to have them set aside.

On January 31, 1983, the Z–R Corp., Dora Kong Corp., and Stanley Shin filed an involuntary petition against CHA in bankruptcy court. Trial was held over three days: August 19, September 12, and October 14, 1983. On December 5, 1983, the bankruptcy court entered its Findings of Fact, Conclusions of Law, and Order for Relief, 36 B.R. 111. CHA timely filed a Motion to Amend Findings of Fact and to Amend Judgment. The bankruptcy court denied that motion on February 7, 1984, and CHA appealed on February 17, 1984.

## I

The so-called emergency rule adopted by this court provides that when the district court reviews rulings of the bankruptcy court, the district judge may "accept, reject, or modify, in whole or in part, the order or judgment ... of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge." Rule Relating to Bankruptcy Proceedings e(2)(B) (D. Hawaii Dec. 23, 1982).

The Ninth Circuit, however, now holds that the appropriate standard of review when a district court undertakes to decide an appeal from the bankruptcy court is the "clearly erroneous" standard for findings of fact and *de novo* review for conclusions of law. *In re Dill*, 731 F.2d 629, 637 (9th Cir.1984). Cf. *In re AOV*

---

**2.** Under the Letter Agreement, CHA bought the Z–R limited interests for $198,000 and the Enoch Kong limited partnership interests for $220,000; and under the Stock Option Purchase Agreement, CHA bought all the stock of Dora Kong Corp. for $882,000. Monthly payments

were to be in the amount of $3,807.50 per month to Z–R Corp., $4,230 per month to Enoch Kong, and $16,962.50 per month to Dora Kong Corp. The payments thus totalled $25,000 per month on the whole purchase price of $1,300,000.

*Industries,* 31 B.R. 1005 (Bkrtcy.D.D.C. 1983) (substantial evidence test applied to findings of fact). This court must follow the Ninth Circuit's standards of review and disregard its own conflicting emergency rule.

## II

11 U.S.C. § 303(h)(1) provides that a bankruptcy court may enter an order for relief only if it concludes that "the debtor is generally not paying such debtor's debts as such debts become due." The principal legal question presented in this appeal is, simply: did the bankruptcy court err in holding that CHA was not generally paying its debts as those debts came due and that involuntary relief was therefore proper? [3]

Framing the question, however, is far more simple than answering it; the language of § 303(h)(1) may seem straightforward, but courts have had difficulty in applying it ever since the Bankruptcy Code took effect. 2 Collier on Bankruptcy ¶ 303.11(1), at 303–20 (15th ed. 1984).

■ The broad principle of § 303(h)(1) has generally generated judicial statements that "it is clear that a court must find more than a prospective inability by the debtor to pay only a few of his debts, and more than a past failure to pay a few of such liabilities." *Matter of 7H Land & Cattle Co.,* 6 B.R. 29, 31 (Bankr.D.Nev.1980) (citing 2 Collier on Bankruptcy, ¶ 303.2, at 303–47 (15th ed. 1984)). The Ninth Circuit states that "a finding that a debtor is not generally paying his debts requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts." *In re Dill,* 731 F.2d 629, 632 (9th Cir.1984). An oft-cited point is the Second Circuit's observation that "the legislative history [of § 303(h)(1) ] clearly points to the insistence by Congress on the generality of default." *In re B.D. International Discount Corp.,* 701 F.2d 1071, 1076 (2d Cir.), *cert. denied,*

— U.S. ——, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

Thus the bankruptcy court must apply these general statements to the facts of the particular case before it. Three factors must be considered. The first is, which of CHA's debts were due and not being paid at the time of the petition? This question also requires a determination of how many creditors held the debts. Second, should any of those debts be excluded from the "not generally paying" determination? (This is important because disputed debts are sometimes excluded from consideration). Finally, applying the requirement of generality of default to the number of includable unpaid debts, was CHA in fact not generally paying its debts as they came due?

### A

■ To decide which of CHA's debts were due and were not being paid at the date of the involuntary petition (January 31, 1983), it is necessary first to consider what Congress meant by the word "debts" when it enacted § 303(h)(1). "Debts" are not synonymous with "liabilities." Section 303(h)(1)'s predecessor in the Bankruptcy Act of 1898 required balance-sheet insolvency—that is, excess of liabilities over assets—before an involuntary petition could be granted. Section 303(h)(1) of the new Code represented a significant departure from that prior law in that it rejected the balance-sheet insolvency test and adopted instead the "equity insolvency" test, which looks only to whether a debtor is meeting its debts as they come due. 2 Collier on Bankruptcy ¶ 303.12, at 303–46—303–47 (15th ed. 1984). 11 U.S.C. § 101(11) defines "debt" as "liability on a claim"; that is further explained in the legislative history as "liability for repayment." From such definitions, this court concludes that "debts" means obligations which, when they come due, will have to be paid out of the debtor's assets.

---

**3.** Section 303(h)(1) also allows for involuntary bankruptcy if a custodian was appointed or took possession of the debtor's property within 120 days before the filing of the date of the petition. Section 303(h)(2) is inapposite here.

The bankruptcy court's conclusions of law apparently were based on CHA's balance sheet as of December 31, 1983. In its conclusions of law, the bankruptcy court listed CHA's current liabilities from that balance sheet and referred to them all as "debts." Two items from the balance sheet, which the bankruptcy court apparently considered as "debts," were accrued gross excise tax, in the amount of $434,400, and an entry for deferred income of $427,574.

■ Unfortunately, the bankruptcy court's legal analysis was flawed. First, it should not have relied exclusively on CHA's balance sheet to determine what its debts were, because the balance sheet does not reflect just those debts that are currently due, and, moreover, because the balance-sheet insolvency test has been abolished from § 303(h)(1) determinations. Second, the bankruptcy court should not have included accrued gross excise tax and deferred income as "debts" material to the determination of whether CHA was generally paying its debts as they became due. Accrued excise tax is not a debt that is due in the sense that it is owing to a creditor who may claim *immediate* payment. Accrued taxes must be included as a liability on a balance sheet to reflect that such taxes will, at some point in the future, have to be paid, but their inclusion does not necessarily indicate that they constitute a debt that is currently due. The bankruptcy court made no factual finding that the accrued tax was currently due.

Neither is deferred income a "debt" in any sense of the word. Deferred income was included on the liability side of the balance sheet because CHA is an accrual basis taxpayer and it therefore had to indicate the year in which income was actually earned, regardless of when it was received. Here as well, the bankruptcy court made

no factual finding that the "deferred income" was a debt that had come due.

Because the bankruptcy court used all of the balance sheet liabilities without discrimination to calculate CHA's debts currently due, and because it included accrued excise tax and deferred income as such debts, this court finds that the bankruptcy court's legal conclusion was faulty. There was testimony at trial that the only debt due and owing by CHA which it was not paying at the time of trial was the debt owed to the Shin Group.

Given the lack of evidence as to what CHA's debts, as opposed to its liabilities, were, this court turns to the balance sheet set out in the bankruptcy judge's Order for Relief for the limited purpose of ascertaining whether any other entries on it might be "debts." The "current liabilities" section of CHA's balance sheet lists as "notes payable" only the debt to the Shin Group and one note to Charles Pankow Associates. There was testimony at trial that the note to Charles Pankow is not yet due. The evidence in the record therefore reveals that the only debt that was due and that CHA was not paying was just the one to the Shin Group.

■ The relationship between the members of the Shin Group [4] makes it necessary to determine next whether CHA's obligations to the Shin Group should be considered as one debt or as three debts for the purpose of making the § 303(h)(1) "not generally paying" determination. There is an established line of authority that nonpayment of one debt rarely constitutes a default general enough to merit relief under § 303(h)(1). The general rule appears to be that if there is but a single debt that a debtor is not paying then the case should be dismissed, since the creditor cannot prove the debtor is generally not paying its "debts" as they become due. In the absence of exceptional circumstances, a debt-

4. This court does not question whether the Shin Group should be treated as only one creditor for the jurisdictional purpose of § 303(b). The Shin Group contains three entities, and the case law suggests that entities can only be combined for § 303(b) purposes if a note is jointly payable

to two or more of them. *In re McMeekin,* 16 B.R. 805 (Bankr.D.Mass.1982). In the record before it, this court finds no promissory notes jointly payable to two or more entities. Therefore, for strictly jurisdictional "counting" purposes, there are three creditors here.

or must neglect more than one debt for the nonpayment to be "general". 2 Collier on Bankruptcy ¶¶ 303.07, 303.12, at 303–19, 303–53 (15th ed. 1984). *See, e.g., In re Nar-Jor Enters.*, 6 B.R. 584 (Bankr.S.D. Fla.1980); *Matter of 7H Land & Cattle Co.*, 6 B.R. 29, 34 (Bankr.D.Nev.1980).

An exception to the rule that one unpaid debt will not merit relief is that a single creditor may get relief if it can show that it has a special need for bankruptcy court relief and that state-law remedies would not be adequate, or that the debtor has engaged in trick, sham, artifice or fraud. 2 Collier on Bankruptcy ¶ 303.07, at 303–19 (15th ed. 1984). If this court should determine that the Shin Group should be treated as a single creditor for purposes of the "not generally paying" determination, then this court will be obliged to determine whether the Shin Group is lacking an adequate remedy in state court or can prove some sort of fraud and therefore has a special need for the special relief of the bankruptcy court.

The Shin Group argues that it should be treated as three separate creditors, because: first, they were legally separate entities (two corporations and an individual). Second, the Letter Agreement of December 12, 1980 specified that the $1.3 million total purchase price was broken down into three parts allocable to the group members in respect of their separate interests. Third, the agreement called for separate monthly payments.

CHA argues that the Shin Group should be treated as a single creditor and CHA's obligation as one debt. First, the same Letter Agreement of December 12, 1980 is titled "Sale of the Kong Family Interests in The Hobron at Waikiki." The offered price is listed as "Purchase Price: $1,300,000"— not as "aggregate price" or even as "total price," but simply as "purchase price." The Agreement specifies under "final payment" that the "unpaid balance of the purchase price" will all be due at the same time (the exact time was to be determined by the earliest of a list of contingencies). There are repeated references to "the

Kong family"—as in "the purchase price paid to the Kong family" throughout the Letter Agreement. Finally, as the bankruptcy court found, all of the payments were to be on the same terms, and all three of the Shin Group have purported to accelerate the full balance under the Agreement.

Second, there are facts outside of the Agreement which indicate that the Shin Group should be treated as a single creditor. Clifford Shin was President of Dora Kong Corporation and President of Z–R Corporation, and he acted as the agent for Dora Kong, Enoch Kong, and Stanley Shin in the various dealings between the Shin Group and CHA. In the state court litigation, the Shin Group members have asserted identical claims against CHA, and CHA has asserted the same defenses and counterclaims against the Shin Group in those state court actions. The reasons for which CHA disputes its debt to the Shin Group are the same with regard to each member of the group. Finally, the Shin Group has been represented by the same attorney in all of its dealings with CHA, from the initial negotiations for sale of the Kong family interests, through the two state court litigations, and in the bankruptcy petition and adversary proceedings in the bankruptcy court and the appeal in this court.

While each of these facts does not alone prove the point, taken together they lead to the inescapable conclusion that there is only one debt within the meaning of § 303(h)(1). Upon the record, this court finds that the Shin Group should be treated as one creditor, and CHA's obligation as one debt, for the purpose of making the § 303(h)(1) "not generally paying" determination. Here, the division into three entities, at least for the purposes of the "not generally paying" determination, is artificial and therefore should be ignored. To hold otherwise would be to elevate the form of the sale agreement over the substance of the transaction. The Shin Group acts as one entity too often for this court to allow its members to benefit by asserting what is essentially the same claim in three ways. The basic fact is that, in one trans-

action, CHA bought Waikiki Hobron Associates interests from the Shin Group, and now there is a dispute over whether CHA must pay the rest of the purchase price.[5]

Policy, as well as reality, dictates that the Shin Group should be treated as a single creditor for purposes of making the "not generally paying" determination. The legislative intent behind § 303(h)(1) was to permit creditors to file a petition against debtors whose default is general in nature. *In re B.D. International Discount Corp.*, 701 F.2d 1071, 1076 (2d Cir.1983). That intent, and the policy behind § 303(h)(1), would be frustrated if what is essentially one unpaid debt were to be counted as three. This court holds that where one thing has been purchased (here the "Kong family interests") for a single purchase price, and where the entire balance of that purchase price is not being paid because of a dispute that concerns the whole purchase price, there is only one unpaid debt for the purposes of the § 303(h)(1) "not generally paying" determination.

### B

■ This court's conclusion that only one unpaid debt is involved here, does not end the case. There remains the question of whether the unpaid balance of the purchase price owing to the Shin Group should be included in the § 303(h)(1) "not generally paying" determination. The question arises because CHA disputes its obligation to the Shin Group and, under certain circumstances, a disputed debt is not included in the "not generally paying" determination even though it is admittedly unpaid. The bankruptcy judge, in ruling on this issue, applied the three-part test set out in *Matter of Covey*, 650 F.2d 877 (7th Cir. 1981). *Covey* held that the debt should be excluded only if (1) the dispute is over the existence of the debt, not its amount; (2) the dispute can be examined without substantial litigation of law or fact; and (3) the interest of the debtor in avoiding bankruptcy outweighs the interests of the creditors.

The bankruptcy judge could not anticipate the Ninth Circuit's opinion in *In re Dill*, 731 F.2d 629 (9th Cir.1984), which expressly rejected the *Covey* analysis. The *Dill* court stated: "[w]e do not adopt *Matter of Covey* as the rule for making that ["not generally paying"] determination where the claim is disputed as to liability. The *Covey* rule appears to lean too heavily toward favoring creditors', as opposed to debtors', interests." 731 F.2d at 632 (citation omitted). The Ninth Circuit stated that the proper test is a simple balancing: the interests of the creditors should be balanced against those of the debtor. *Id.* at 632.

The reasoning that led to the decision in *Dill* has been used by several other courts that found *Covey* to be too restrictive. *See In re R.N. Salem Corp.*, 29 B.R. 424, 429 (S.D.Ohio, W.D.1983) (court rejected *Covey* test because it forces debtors to pay legitimately disputed debts to avoid involuntary bankruptcy and would allow creditors to use the bankruptcy courts as a collection device where debts are disputed); *In re B.D. International Discount Corp.*, 701 F.2d 1071, 1077 (2d Cir.1983) (court refused to adopt *Covey*, saying that "[w]e have difficulty in believing that Congress intended that a debtor should be found to be generally not paying its debts as they become due ... when the claim is subject to serious dispute ...."). *See also In re All Media Properties*, 5 B.R. 126 (Bankr.S.D. Tex.1980), *aff'd.* 646 F.2d 193 (5th Cir. 1981); *In re SBA Factors of Miami*, 13 B.R. 99 (Bankr.S.D.Fla.1981); *In re Nar-Jor Enters.*, 6 B.R. 584, 586 (Bankr.S.D. Fla.1980) *In re Karber*, 25 B.R. 9, 14 (Bankr.N.D.Tex.1982).

■ The Ninth Circuit rule, of course, governs this court and the bankruptcy court. Therefore, balancing of the creditors' interest against the debtors' interest is required. The Shin Group's interest here is in being paid the balance of the purchase

---

**5.** The local vernacular provides the ideal label for the Shin Group, namely a "hui." The closest English equivalent in this case might be "trinity," since the Shin Group is at once three indi-viduals holding one debt. Until English develops a term conveying every nuance of "hui," however, the analysis above will have to suffice.

price for the Kong family interests. CHA's interest is in avoiding an involuntary bankruptcy.

Creditors' interests are generally measured by whether the creditors can get adequate relief elsewhere. In evaluating the strength of the Shin Group's interests here, that group presents but a single-creditor situation. Where one creditor brings an involuntary petition, and especially where the debt is disputed, this court must take a hard look at why the creditor needs relief in the bankruptcy court. *In re Blaine Richards,* 16 B.R. 362, 364 (Bankr.E.D.N.Y.1982). Moreover, as noted earlier, generally one creditor with one debt cannot put the debtor into involuntary bankruptcy unless some special circumstance, such as inadequacy of state court remedies, or the debtor's trick, fraud, artifice, or sham, is found.

If a creditor can go to state court to collect a debt, the bankruptcy courts have been adamant in refusing relief. *In re Nar-Jor Enters.,* 6 B.R. 584, 586 (S.D.Fla. 1981), *In re R.N. Salem Corp.,* 29 B.R. 424, 431 (S.D.Ohio W.D.1983). *In re Blaine Richards,* 16 B.R. 362 (Bankr.E.D.N.Y. 1982), mandates that even the existence of preferences does not establish the lack of adequate remedy elsewhere.

In this case, then, the questions are whether the Shin Group has an adequate remedy in state court or whether it can demonstrate some special need for bankruptcy relief. In April of 1982, the Shin Group filed a suit in state court to collect the balance of CHA's obligation to it. The bankruptcy court found that the Shin Group had failed to prosecute that action as of the time the Order for Relief was issued on December 5, 1983. Were the Shin Group to prevail in state court, there has been no showing that it could not get a judgment against CHA upon which it could then execute. Further, pursuant to CHA's agreement with SAJE Ventures II executed on April 15, 1982, SAJE has agreed to indemnify CHA if the Shin Group is successful in its claims.

The Shin Group argues that its state court remedies are inadequate because of pre- and post-petition transfers that are remediable only by the bankruptcy court. This contention is remarkably similar to those made by the creditor in *In re Blaine Richards,* 16 B.R. 9 (Bankr.E.D.N.Y.1982), *supra,* and *In re Karber,* 25 B.R. 9 (Bankr. N.D.Tex.1982). *Blaine Richards* held that the mere assertion of preferential transfers was insufficient to establish the propriety of the involuntary petition. The *In re Karber* court, in a case where one creditor holding a disputed claim brought an involuntary petition, held that state courts can set aside fraudulent transfers, and therefore even the creditor's allegation of fraudulent transfers was insufficient to sustain the petition. These cases bely the Shin Group's concerns regarding the adequacy of its state court remedy.

Moreover, the Shin Group filed a second action in state court on November 15, 1983, alleging fraudulent transfers and seeking to have them set aside. If the Shin Group believes that it can persuade the state court to set aside the allegedly fraudulent transfers, then its assertion that the bankruptcy court offers the only possible adequate remedy appears insincere. The bankruptcy court was never meant to serve as an insurance policy for creditors who fear that the state courts will not give them what they want. *In re R.N. Salem Corp.,* 29 B.R. 424, 429 (S.D.Ohio W.D. 1983).

The state-court remedies available to the Shin Group in the two suits that are already pending have not been shown to be inadequate. From the record on appeal, this court can but determine that adequate relief can be given in state court. Therefore, only clear manifestation of fraud, artifice, trick or sham on the debtor's part that could entitle the single petitioning creditor to relief. Cf., *In re B.D. International Discount Corp.,* 701 F.2d 1071 (2d Cir. 1983).

The appellees' brief on appeal goes on at great length about how CHA allegedly engaged in "statutory fraud" and therefore the Shin Group should be able to take advantage of this exception. The record does not support such argument. Nothing

in the record before this court or in the bankruptcy court's findings of fact indicates that fraud, trick, artifice or sham has been employed. The present unsworn and unsupported allegations of appellees' attorney are insufficient. The court concludes that there was no behavior engaged in by CHA that could warrant the relief appellees seek.

It is clear that since the Shin Group has apparently adequate state-law remedies, and because no fraud, artifice, trick, or sham was involved, the Shin Group's interest is simply that of a creditor who wishes to collect on a disputed debt.

Balanced against the Shin Group's interests are those of CHA. The bankruptcy court held that because CHA has closed a sale of all of its assets to SAJE Ventures II, it is no longer actively conducting business and therefore has no interest in avoiding involuntary bankruptcy. The bankruptcy court held that this factor was determinative and that CHA's interests therefore could not outweigh those of the Shin Group.

This court finds that the bankruptcy court's evaluation of CHA's interests was incomplete. CHA has an interest in not being required to litigate a dispute with the Shin Group both in state court and in bankruptcy court. CHA also has an interest in not being put into involuntary bankruptcy by one creditor with whom it has a bona fide dispute—regardless of whether it is still doing business.

Even though CHA has sold the assets of its business, its interest in avoiding an involuntary bankruptcy is still strong enough to overcome the Shin Group's interest, which was simply a wish to be paid, a wish that could be granted by the state court in the cases which the Shin Group had already filed. Therefore, the unpaid debt to the Shin Group should not be included in the § 303(h)(1) "not generally paying debts as they become due" determination. It is a

simple, disputed debt. It is established that "where a debt is not being paid for demonstrably other reasons than insolvency the test [of not generally paying] is not met." *In re R.N. Salem Corp.*, 29 B.R. 424, 427 (S.D.Ohio W.D.1983).

If the debt to the Shin Group is excluded, then because it was CHA's single unpaid debt, the finding that CHA was not generally paying its debts as they became due is clearly erroneous.[6] Therefore, as the "not generally paying" test is the only one that justifies an involuntary petition in a case like this, the Order For Relief should not have been granted.

This result is in accordance with the most basic policies underlying the Bankruptcy Code. In *In re Dill*, 731 F.2d 629, 632 (9th Cir.1984), the Ninth Circuit directed courts balancing creditors' and debtors' interests to consider any underlying policies of bankruptcy law that might be implicated in the facts of the case. There are two policy reasons for the system of bankruptcy courts: to give debtors a fresh start and to ensure orderly ranking of creditors' claims.

Here, neither one of these purposes would be served by allowing the Order for Relief to stand. First, CHA did not need a fresh start. It was failing to pay only one of its debts. Moreover, it was going to stop operating under an agreement of sale to SAJE Ventures II. Second, there was no need for any "orderly ranking of creditors" because only one debt was not being paid.

Bankruptcy courts exist for the purpose of giving extraordinary relief when the rules and courts that ordinarily take care of the day-to-day disputes that occur in business are no longer adequate. Here, the special powers of the bankruptcy court were not needed to resolve the Shin Group-CHA dispute.

These general policy reasons, along with the more specific reason that CHA was not generally failing to pay its debts as they

---

**6.** It should be apparent that even if the Shin Group were not counted as a single creditor, the rationale applied above to exclude the disputed debt for the § 303(h)(1) determination would still apply. CHA had a bona fide dispute with all three Shin Group members, and each member had adequate remedies in state court. Separately or together, the Shin Group cannot use the bankruptcy court as a collection vehicle.

became due, mandate that relief sought by appellees was improper. The involuntary petition should have been denied. The Order for Relief was improperly granted.

IT IS THEREFORE ORDERED THAT the Order for Relief is hereby VACATED;

IT IS FURTHER ORDERED that the case is REMANDED to the bankruptcy court with instructions to dismiss the involuntary petition.