In the Matter of Earl SIMS, Jr., Debtor.

**SUBWAY EQUIPMENT LEASING CORPORATION, Subway Restaurants, Inc., and Subway Sandwich Shops, Inc., Appellants–Cross–Appellees,**

v.

**Earl SIMS, Jr., Appellee–Cross–Appellant.**

In the Matter of Dorothy SIMS, Debtor.

**SUBWAY EQUIPMENT LEASING CORPORATION, Subway Restaurants, Inc., and Subway Sandwich Shops, Inc., Appellants–Cross–Appellees,**

v.

**Dorothy SIMS, Appellee–Cross–Appellant.**

Nos. 92–3212, 92–3213.

United States Court of Appeals, Fifth Circuit.

June 21, 1993.

---

Daniel K. Rester, Richard B. Easterling, Hoffman, Sutterfield, Ensenat & Bankston, Baton Rouge, LA, for appellants-cross-appellees.

James E. Ferguson, Baton Rouge, LA, for appellee-cross-appellant.

Before DUHÉ and BARKSDALE, Circuit Judges, and HUNTER [1], District Judge.

BARKSDALE, Circuit Judge:

Principally at issue is whether, and when, a creditor corporation filing an involuntary bankruptcy petition under 11 U.S.C. § 303 may be held to be the alter ego of another, and thus not considered a requisite separate entity for filing purposes. The district court held, *inter alia*, that the three petitioning corporations—Subway Equipment Leasing Corporation (SEL), Subway Restaurants, Inc. (SRI), and Subway Sandwich Shops, Inc. (SSS)—are alter egos of another corporation, and therefore count as only one corporation. SEL, SRI, and SSS (the creditors) appeal from that court's reversal of the bankruptcy court's entry of orders for relief in their separate involuntary bankruptcy proceedings against Earl Sims, Jr. and his wife, Dorothy Sims (the debtors). We REVERSE the judgments of the district court, and REMAND for further proceedings in the bankruptcy court.

I.

The creditors are affiliated with the Subway sandwich shop organization. Doctor's Associates, Inc. (DAI), is the franchisor. SSS, incorporated in Connecticut in 1983, and SRI, incorporated in Delaware in 1986, acquire leases and sublease property to Subway franchisees. SSS operated in the Baton Rouge area; SRI, the New Orleans area. SEL, incorporated in Connecticut in 1985, leases restaurant equipment to Subway franchisees and other unrelated parties.

It is undisputed that the petitioning creditor corporations are in good standing in their States of incorporation. Minutes reflecting annual meetings held by each corporation were introduced into evidence. Each maintained a separate bank account during the time it dealt with the debtors. With the exception of additional vice presidents for SRI and SSS, all three of the creditor corporations have the same officers. Although SEL has employees, SRI and SSS operate through their officers. DAI does not own stock in them. For economic reasons, DAI's legal staff and contract leasing staff provided services to all of the corporations that dealt with Subway franchisees; similar services were provided to franchisees upon request.

Between 1981 and 1987, the debtors entered into four franchise agreements with DAI. Two were in Baton Rouge, on property subleased from SSS; two, in New Orleans, with subleases from SRI. SEL entered into equipment leases for the four franchises. In June 1988, the debtors defaulted on the sublease and equipment lease at one of the New Orleans shops; that September and October, at the other three.[2]

___

1. Senior District Judge of the Western District of Louisiana, sitting by designation.

2. In April 1981, Earl Sims entered into the first franchise agreement with DAI. In early 1984, SSS leased space in Baton Rouge and subleased it to Earl Sims. In September 1988, Earl Sims defaulted on the rental payments due under the sublease. The lessor demanded $240,000 from SSS, which eventually settled the claim in August 1989 for $14,727.15. Earl Sims also defaulted on an equipment lease for that franchise; the unpaid balance is $1,014.12.

The debtors entered into a second franchise agreement with DAI in early 1986 in Baton Rouge. SSS leased space there and subleased it to the debtors. The debtors defaulted on the sublease and the equipment lease in October 1988. SSS settled the lessor's claim for unpaid rent for $16,627.05 in August 1989; SEL is owed $4,964.79 on the equipment lease.

In October 1987, DAI entered into a franchise agreement for New Orleans with the debtors, Charles and Bonnie Forte, and Frank and Selena Rankins. SRI leased property there and subleased it to the debtors, Rankins, and Fortes. In September 1988, the debtors defaulted on the sublease and the equipment lease. SEL is owed $26,651.78 on the equipment lease; and, as the result of the default on the sublease, SRI was

In January 1987, Earl Sims became a development agent for DAI[3]; but in 1988, they became involved in several disputes regarding that work. As noted, the debtors defaulted that June on the leases with SRI and SEL at one of the franchises. Earl Sims testified that DAI began withholding payment in August 1988 for his development agent work. The debtors allege that DAI applied the withheld funds to past-due rent on the equipment leases and attorney's fees. As also noted, that September and October, the debtors defaulted at the other three locations.

In bankruptcy court, after several false starts commencing in November 1988, the creditors filed separate amended involuntary petitions against the debtors in June 1990.[4] The debtors moved to dismiss for bad faith filing. After a hearing in December 1990, the bankruptcy court denied the motions to dismiss and entered orders for relief, granting the involuntary petition in each proceeding. The debtors appealed to the district court.

In February 1992, the district court reversed the bankruptcy court. The creditors appealed, and the debtors cross-appealed.

## II.

At issue is whether the creditors satisfied the requirements of 11 U.S.C. § 303, which governs the filing of involuntary bankruptcy petitions. That section provides, in pertinent part, that, if the debtor has 12 or more creditors, an involuntary petition may be filed by three or more "entities" holding claims against the debtor that are not contingent and not subject to a "bona fide dispute", in the aggregate amount of at least $5,000 more than the value of liens on property of the debtor. 11 U.S.C. § 303(b)(1). Relief is appropriate if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute." 11 U.S.C. § 303(h)(1). A debtor may recover costs, attorney's fees, and damages against petitioning creditors if the case is dismissed and the petition was filed in bad faith. 11 U.S.C. § 303(i).

The bankruptcy court found that the creditors were separate entities for § 303(b)(1) purposes, that the debtors were generally not paying their debts, that the claims of the creditors were not contingent or subject to bona fide disputes, and that the petitions were not filed in bad faith. The district court disagreed, holding that the creditors are alter egos of DAI, and thus could be counted as only one of the three requisite § 303(b)(1) creditors. It also concluded that, because of the development agent disputes between DAI and Earl Sims, the creditors' claims were contingent and subject to bona

---

obligated to pay rent of $12,404.31 to the lessor and $12,011.69 for a build-out loan.

The debtors, Rankins, and Fortes entered into a second franchise agreement with DAI for New Orleans in 1987. SRI leased space there and subleased it to the debtors, Rankins, and Fortes. Earl Sims entered into an equipment lease with SEL for that franchise. (Although the lease specifies Earl Sims as the only lessee, it was also signed by Dorothy Sims, the Fortes, and the Rankins.) In June 1988, the debtors, Rankins, and Fortes defaulted on the sublease, and Earl Sims defaulted on the equipment lease. The unpaid balance on the latter is $33,865.68; and the lessor has sued SRI for $80,000 in unpaid rent.

**3.** Jeffrey Macarz, an attorney in DAI's legal department, testified that a development agent is "an independent contractor who helps develop a different area, a different part of the country for purposes of putting in a Subway Shop. It helps sell franchises and negotiates some of the leases and that kind of thing."

**4.** In November 1988, SEL filed a joint involuntary petition against Earl and Dorothy Sims under chapter 7 of the Bankruptcy Code. The debtors filed a motion to dismiss and sought damages for bad faith filing. SEL amended the petition in June 1989, to join SRI and SSS as petitioning creditors. That September, the bankruptcy court dismissed the joint involuntary petition without prejudice, on the ground that the Bankruptcy Code does not allow the filing of a joint involuntary petition against a debtor and spouse; it denied the debtors' motion to dismiss. *See King v. Fidelity Nat'l Bank of Baton Rouge,* 712 F.2d 188, 190 (5th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984). The creditors appealed to the district court, and the debtors cross-appealed. In March 1990, the district court reversed the dismissal, and remanded the case to the bankruptcy court with instructions to sever the joint petition.

fide disputes. Finally, it concluded that the bankruptcy court erred in denying the motions to dismiss for bad faith filing.

## A.

 We first address the three issues raised by the debtors' cross-appeals. It is more than well-settled that a party cannot appeal from a judgment unless "aggrieved" by it. *E.g., Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 333–34, 100 S.Ct. 1166, 1171–72, 63 L.Ed.2d 427 (1980). Simply stated, a party who has obtained a judgment in his favor, granting the relief sought, is not aggrieved by it. A cross-appeal filed for the sole purpose of advancing additional arguments in support of a judgment is "worse than unnecessary", because it disrupts the briefing schedule, increases the number (and usually the length) of briefs, and tends to confuse the issues. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir.1987), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). Such arguments should, instead, be included in the appellee's answering brief.

### 1.

The debtors contend first that the district court erred by not finding that the bankruptcy court "committed patent error upon the face of the record when the Bankruptcy Court intentionally refused to disqualify the [creditors] as a matter of law for bad faith filing". They rely on three grounds: (1) the creditors had filed suit against the debtors prior to filing the involuntary petitions, and the debtors had asserted counterclaims; (2) DAI began withholding Earl Sims' development agent payments in August 1988; and (3) the creditors failed to mitigate their damages after the debtors abandoned one of the New Orleans stores in June 1988.

The district court *reversed* the denial of the motions to dismiss for bad faith filing; therefore, the debtors are not aggrieved by the judgments. Accordingly, this contention is not the proper subject of a cross-appeal.

### 2.

Similarly, the second issue is not proper for a cross-appeal. The debtors assert that the district court erred by not finding that the creditors and their counsel "intentionally committed outright fraud and deceptions upon the Court". But, they do not seek to alter the judgments, which, as noted, granted the relief sought. In any event, their unnecessarily verbose, rambling allegations of fraud upon the court, and their repetitious attacks on the veracity and integrity of the creditors (including witnesses and counsel), are wholly unwarranted on the record before us.[5]

### 3.

 Finally, the debtors maintain that they are entitled to sanctions, because the creditors' appeals are frivolous. A cross-appeal, however, is an improper vehicle for such a request. Obviously, the district court did not—and could not—consider a request for sanctions for a frivolous appeal to this court. *See* Fed.R.App.P. 38. Accordingly, there is no decision on this issue from which the debtors could cross-appeal. (In any event, the appeals are not frivolous.)

## B.

The creditors contend that the district court erred in (1) applying the "alter ego" theory to treat them (SEL, SRI, and SSS) as one creditor; (2) holding that the debtors were current on all obligations as of September 1988; (3) considering DAI as a party; (4) addressing the issue of bad faith filing, and considering the controversy between DAI and Earl Sims as the basis for finding that the creditors filed in bad faith; and (5) relying upon proffered evidence which was excluded by the bankruptcy court, when the debtors did not challenge that ruling on appeal to the district court.

The key issue is the alter ego ruling. The other claimed errors flow from it: if the creditors are not the alter egos of DAI, it follows that the district court erred in considering Earl Sims' development agent dispute

---

5. These allegations are similar to the "scurrilous, impertinent, scandalous and[/]or disrespectful" allegations that caused the district court to strike the debtors' initial brief in that court.

with DAI, which is the basis for its conclusions that the debtors were current on all obligations as of September 1988, and that the creditors' claims were contingent and subject to bona fide disputes; erred in considering DAI as a party; erred in holding that the creditors filed the petitions in bad faith; and erred in relying on the proffered evidence.

### 1.

As stated, when a debtor has more than 12 creditors, § 303(b)(1) requires an involuntary petition to be brought by three or more entities, each of which must be the holder of a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute. It is undisputed that SEL, SRI, and SSS each hold separate claims against the debtors, based on the previously described subleases and equipment leases. The district court's conclusions that those debts are contingent and subject to bona fide disputes are based on its consideration of Earl Sims' development agent dispute with DAI. Accordingly, as noted, the dispositive issue, with respect to the creditors' qualifications under § 303(b)(1), is whether they have identities separate from DAI.

The Bankruptcy Code's definition of "entity" includes "person"; and "person" includes "corporation". 11 U.S.C. §§ 101(15), 101(41). The Code is silent, however, regarding whether, or under what circumstances, the separate identity of a corporate creditor should be disregarded for § 303(b)(1) purposes. Only a few cases have addressed the issue. Moreover, the debtors have not cited, nor have we found, any case in which the corporate identity of a petitioning creditor has been disregarded.

The only case to treat the issue in significant detail is *In re Gibraltor Amusements, Ltd.*, 291 F.2d 22 (2d Cir.), *cert. denied*, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961), which involved an involuntary petition filed

under the Bankruptcy Act's predecessor to § 303(b). Two of the three petitioning creditors were The Wurlitzer Company and Wurlitzer Acceptance Corporation (WAC). The debtor contended that WAC was not a separate creditor, because it was a wholly-owned subsidiary, controlled by Wurlitzer. Although WAC's business consisted solely of financing the sales of Wurlitzer's products, it had obtained its own bank financing and had been a separate corporate taxpayer. *Id.* at 24. The evidence indicated that both corporations had "scrupulously honored" the separate corporate form of WAC. *Id.* WAC's claim was based on two notes that had been purchased from Wurlitzer long before the filing of the petition, and there was "no evidence of attempted subversion of the Bankruptcy Act." *Id.*

The majority held that ordinary principles of corporation law did not warrant disregarding WAC's corporate identity, because there was no fraud and the corporate form had been strictly honored as to assets and intercorporate transactions. *Id.* at 24–25. The fact that Wurlitzer handled most of WAC's collections was "not enough from which to infer an internal disregard of WAC's separate identity," and "was undoubtedly cheaper and more efficient." *Id.* at 25 n. 1.

The majority further concluded that neither the language nor the policy of the Bankruptcy Act required a different result:

> The courts have long evinced a disposition to honor the separate corporate entity in bankruptcy matters.... If Congress meant to alter ordinary judicial rules governing corporations, it should have so provided specifically.

*Id.* at 25 (citations omitted). It indicated that a different result might be warranted if there had been evidence of "traffic in claims merely for the purpose of creating a sufficient number of petitioning creditors", but such evidence was not present.[6] *Id.* at 26.

---

6. Bankruptcy Rule 1003 is designed to prevent such "trafficking". It requires a transferor or transferee of a claim to attach evidence of the transfer to the involuntary petition, as well as "a signed statement that the claim was not transferred for the purpose of commencing the case and setting forth the consideration for and terms

of the transfer." *Id.* An entity which "has transferred or acquired a claim for the purpose of commencing a case for liquidation under chapter 7 or for reorganization under chapter 11 shall not be a qualified petitioner." *Id.* As described, the creditors did not acquire their claims against the debtors through transfer.

It therefore rejected the debtor's contention that WAC was not a separate creditor.

The dissent assumed that WAC would be regarded as a separate corporation under state law in contract or tort litigation, but concluded that the Bankruptcy Act required a different result:

> [T]he entire process that resulted in the enactment of the Act of 1898 was a pitched battle between those who wanted to give the creditor an effective remedy to assure equal distribution of a bankrupt's assets and those who were determined to protect the debtor from the harassment of ill-considered or oppressive involuntary petitions, including those by a single creditor interest. The requirement of three creditors was one of many provisions reflecting a compromise between the two opposing positions. It is not doing justice to this history to suggest that if Congress had meant to prevent a wholly owned subsidiary from being counted as a petitioning creditor separate from its parent, it should have explicitly said so.... Here the purpose to require three separate creditor interests, separate in reality and not merely in legal form, is not difficult to discern.

*Id.* at 28 (Friendly, J., dissenting).

Only a few cases involving related petitioning creditors have been decided under the Code. In *In re First Energy Leasing Corp.*, 38 B.R. 577 (Bankr.E.D.N.Y.1984), the court noted that there was "significant interrelatedness" between the petitioning creditors, and that two of them had been substantially motivated to join in the petition because of their relationship with the third. *Id.* at 584. Nevertheless, it treated them as separate entities, reasoning that "§ 303(b) of the Code constitutes a liberal grant to claimants to bring before the court in an expedited manner the issue of the debtor's solvency." *Id.*

In *In re McMeekin*, 16 B.R. 805 (Bankr. D.Mass.1982), one of the petitioning creditors was owed a debt on a judgment; the other two were a husband and wife, as joint payees of a promissory note. The court held that the husband and wife, as joint payees, qualified as separate entities for § 303(b)(1) purposes. *Id.* at 808. But, it noted that each entity must be the holder of a claim. *Id.* Accordingly, it focused upon whether each had a separate right to payment, and concluded that, under Massachusetts law, the right to payment could only be enforced by both of them. *Id.* Because the husband and wife had only one claim, there were only two petitioning creditors who held claims; therefore, the petition was dismissed. *Id.* at 809.

Three closely-related creditors, Dora Kong Corporation, Z–R Corporation, and Stanley Shin, collectively referred to as the "Shin Group", brought the involuntary petition in *In re Central Hobron Associates*, 41 B.R. 444 (D.Hawaii 1984). Dora Kong Corporation was the general partner of Waikiki Hobron Associates (WHA); Clifford Shin, its president. Z–R Corporation was a limited partner in WHA; Clifford Shin was also its president. Enoch Kong was also a limited partner in WHA. The creditors were referred to in sales documents as "the Kong family". *Id.* at 445. The court did not question whether the Shin Group should be treated as only one creditor under § 303(b). It noted that the Shin Group contained three entities, and that the case law suggested that entities can only be combined for § 303(b) purposes if a note is jointly payable to two or more of them. *Id.* at 448 n. 4 (citing *In re McMeekin*). Because there were no such notes, the court concluded that the creditors should be treated as separate entities.[7]

Finally, the Bankruptcy Court for the Eastern District of Tennessee has held in two cases that the FDIC may be treated as a petitioning creditor in its corporate capacity, and as a separate petitioning creditor in its capacity as receiver. *In re Crabtree*, 32 B.R. 837 (Bankr.E.D.Tenn.1983); *In re Butcher*,

---

7. The court held, however, that the Shin Group should be treated as a single creditor for purposes of the "not generally paying" determination, because there was only one debt within the meaning of § 303(h)(1): "[W]here one thing has been purchased ... for a single purchase price, and where the entire balance of that purchase price is not being paid because of a dispute that concerns the whole purchase price, there is only one unpaid debt for the purposes of the § 303(h)(1) 'not generally paying' determination". *In re Central Hobron Associates*, 41 B.R. at 450.

32 B.R. 572 (Bankr.E.D.Tenn.1983). In sum, the above cases more than suggest that ordinary principles of corporation law apply in determining whether related entities will be combined for § 303(b)(1) purposes.

■ Based on its review of the legislative history, *Collier on Bankruptcy* states that the policy considerations for the rules for counting creditors are: (1) "the fear that involuntary bankruptcy might be used by one or two recalcitrant creditors as a means of harassing an honest debtor"; and (2) "the possibility that the threat of an involuntary petition would be used to compel the debtor to make preferential payments to one or more litigious creditors". *2 Collier on Bankruptcy,* ¶ 303.08[12][a], at 303–42 (1993). Ordinary principles of corporation law governing the disregard of corporate identity are adequate to serve these policies.[8] Like the majority in *Gibraltor*, we find nothing in the language or policy of the Bankruptcy Code that would support the adoption of different, or more lenient, rules for piercing the corporate veil of creditors seeking § 303 involuntary relief. Likewise, we agree with *Gibraltor* that had Congress intended for different rules to apply for § 303(b), it would, and easily could, have so provided.[9]

We turn now to whether such principles warrant SEL, SRI, and SSS being treated as the alter egos of DAI. The bankruptcy court found that the creditors are separate entities within the meaning of § 303(b)(1). The district court, however, concluded that those entities are the alter egos of DAI, and constituted only one creditor for § 303(b)(1) purposes. "[T]he burden of proving an alter ego relationship rests squarely on the shoulders of the party seeking to disregard the corpo-

rate entity". *Matter of Multiponics, Inc.,* 622 F.2d 709, 723 (5th Cir.1980).

On appeal of a bankruptcy case, reviewing courts must accept the bankruptcy court's findings of fact, unless they are clearly erroneous. Bankruptcy Rule 8013. Issues of law are reviewed *de novo. Id.* Because the resolution of alter ego issues is "heavily fact-specific", and must be based on a consideration of "the totality of the circumstances", the clearly erroneous standard applies to the bankruptcy court's finding that the creditors are separate entities. *United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 694 (5th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986).

■ The district court, however, applied a "less stringent" clearly erroneous standard, because the bankruptcy court's decision was based, in part, on documentary evidence. But, Fed.R.Civ.P. 52(a), made applicable by Bankruptcy Rule 8013, makes no distinction between findings of fact based on oral or documentary evidence.[10] The bankruptcy court's factual findings, whether based on documentary or oral evidence, are entitled to equal deference.

It is fundamental, as explained in *Berger v. Columbia Broadcasting System, Inc.,* 453 F.2d 991 (5th Cir.), *cert. denied,* 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972), that "one of the principal purposes for which the law has created the corporation" is to give it an existence separate and distinct from its stockholders, thus giving them an opportunity to limit their personal liability. *Id.* at 994. The various theories for piercing the corporate veil have been created for the purpose of disregarding that separate legal identity in situations where equity demands it, such as when the owners have misused the corporate

---

8. Needless to say, the legal principles for disregarding a corporation's separate identity have been applied primarily in situations in which a creditor or other party seeks to use them as a sword, to impose liability upon the owners of a corporation. They may have limited utility under § 303, when a debtor is attempting to use them as a shield, to avoid involuntary bankruptcy.

9. *Cf. Joslyn Manufacturing Co. v. T.L. James & Co., Inc.,* 893 F.2d 80, 82–83 (5th Cir.1990) (refusing to extend liability to parent corporations

whose subsidiaries violated the Comprehensive Environmental Response, Compensation, and Liability Act, on the ground that, if Congress intends for legislation to change traditional concepts of corporation law, it should make that intent specific), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991).

10. Indeed, the 1985 amendment specifically rejected this Circuit's application of the "less stringent" standard applied by the district court. Fed.R.Civ.P. 52(a), advisory committee's note, 1985 amendment.

form, or have established it for a fraudulent purpose or to commit an illegal act. *See Krivo Industrial Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1102 (5th Cir.1973). "Another exception arises where ... a parent company totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent." *Jon–T Chemicals*, 768 F.2d at 691. "[T]he alter ego doctrine and piercing of the corporate veil are truly exceptional doctrines, reserved for those cases where the officers, directors or stockholders utilized the corporate entity as a sham to perpetuate a fraud, to shun personal liability, or to encompass other truly unique situations." *Multiponics*, 622 F.2d at 724–25; *see also Joslyn Mfg. Co.*, 893 F.2d at 83 ("Veil piercing should be limited to situations in which the corporate entity is used as a *sham* to perpetrate a fraud or avoid personal liability".).[11] "[O]ur cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying alter ego theory to pierce the corporate veil". *Jon–T*, 768 F.2d at 691.

In determining that the creditors are the alter egos of DAI, the district court applied the "laundry list" of factors set forth in *Jon–T*.[12] It failed, however, to consider crucial distinctions between *Jon–T* and these cases. One is that in *Jon–T*, the government sought to use the alter ego theory to hold Jon–T Chemicals liable for subsidies erroneously paid to a wholly-owned subsidiary. *Id.* at 689. Here, the debtors are not seeking to hold DAI liable for any debts owed to them by the creditors; instead, they are attempting to use the alter ego theory to block the creditors' efforts to place them in involuntary bankruptcy.

Another, and most critical, distinction is that the government's claims for fraudulent misrepresentation and conversion in *Jon–T* sounded in tort rather than contract. *Id.* at 693. Although a finding of fraud is not essential in tort cases, "in contract cases, fraud is an essential element of an alter ego finding." *Id.* at 692.

The reason for this distinction is clear. In a contract case, the creditor has willingly transacted business with the subsidiary. If the creditor wants to be able to hold the parent liable for the subsidiary's debts, it

---

11. The bankruptcy and district courts did not state whether they were applying state or federal common law in deciding the alter ego issue, and the parties have not addressed that point. SEL and SSI were incorporated under the laws of Connecticut; SRI, Delaware. Connecticut "takes a conservative approach to piercing the corporate veil", requiring proof of inequitable or unjust conduct with regard to the particular transaction attacked. Presser, *Piercing the Corporate Veil*, § 2.07 at 2–44 (1992) (citing *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.*, 187 Conn. 544, 447 A.2d 406 (1982)). Delaware requires "fraud or something like it". *Id.*, § 2.08 at 2–53 (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 268 (D.Del.1989)). Because these standards are substantially identical to federal common law, particularly with respect to the issues involved in this case, it is not necessary for us to determine whether a uniform federal alter ego rule is required for § 303. *Cf. Jon–T Chemicals*, 768 F.2d at 690 n. 6.

12. The factors include whether:
 (1) the parent and the subsidiary have common stock ownership;
 (2) the parent and the subsidiary have common directors or officers;
 (3) the parent and the subsidiary have common business departments;
 (4) the parent and the subsidiary file consolidated financial statements and tax returns;
 (5) the parent finances the subsidiary;
 (6) the parent caused the incorporation of the subsidiary;
 (7) the subsidiary operates with grossly inadequate capital;
 (8) the parent pays the salaries and other expenses of the subsidiary;
 (9) the subsidiary receives no business except that given to it by the parent;
 (10) the parent uses the subsidiary's property as its own;
 (11) the daily operations of the two corporations are not kept separate; and
 (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Jon–T*, 768 F.2d at 691–92. But, as noted, resolution of alter ego issues must be based on a consideration of "the totality of the circumstances"; there is "no litmus test". *Id.* at 694. Accordingly, although the factors in the *Jon–T* "laundry list" are relevant for the totality of the circumstances inquiry, they are not dispositive. Even if all are found to be applicable, other circumstances might justify a refusal to pierce the corporate veil.

can contract for this. Unless the subsidiary misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the subsidiary; it should not be able to complain later that the subsidiary is unsound. In a tort case, by contrast, the creditor has not voluntarily chosen to deal with the subsidiary; instead, the creditor relationship is forced upon it. Thus, the question of whether the creditor relied on misrepresentations by the subsidiary is irrelevant. Where a parent establishes a subsidiary, undercapitalizes it, and dominates it to such an extent that the subsidiary is a mere conduit for the parent's business, then the parent should not be able to shift the risk of loss due to the subsidiary's tortious acts to innocent third parties.

*Id.* at 693. *See also Casey v. Galli*, 94 U.S. 673, 680, 24 L.Ed. 168 (1877) ("[W]here a party has contracted with a corporation and is sued upon the contract, [that party] is [not] permitted to deny the existence or the legal validity of such corporation. To hold otherwise would be contrary to the plainest principles of reason and of good faith, and involve a mockery of justice. Parties must take the consequences of the position they assume.").

■ Here, there is no attempt by the debtors to hold DAI liable for any debts owed them by the creditors—indeed, the only claims that are relevant in determining the creditors' qualifications under § 303(b)(1) are those of the creditors against the debtors. Those claims are based on contracts: the subleases and equipment leases for the four franchises. DAI is not a party to any of those contracts, and would have no right to file suit to collect the debts owed to SEL, SRI, and SSS. *See* Fed.R.Civ.P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest"); *2 Collier on Bankruptcy*, ¶303.08[9], at 303–32 (1993). The debtors have not alleged, nor is there any evidence, that SEL, SRI, or SSS were established for a fraudulent purpose, or for the purpose of subverting the three-creditor requirement of § 303(b)(1). Nor have the debtors alleged that they were fraudulently induced to enter into the contracts upon which the creditors' claims are based.[13] Instead, the debtors voluntarily entered into separate contracts with each of the creditors, and thereby obtained locations and equipment in order to conduct their franchise operations.

■ The district court's opinion makes no reference to fraud, and its decision to disregard the corporate identities of the creditors is not based on fraud. In the absence of such a finding, the alter ego doctrine is inapplicable in a case in which the claims sound in contract rather than tort. Accordingly, it was not necessary for the district court to consider the *Jon–T* "laundry list".[14]

13. The only fraud alleged by the debtors is fraud on the court, allegedly committed by the creditors' counsel and witnesses. These allegations are baseless. In any event, they are irrelevant to the alter ego question, which focuses on the transactions giving rise to the debts.

14. The debtors rely on *Yates v. Doctor's Associates, Inc.*, 193 Ill.App.3d 431, 140 Ill.Dec. 359, 549 N.E.2d 1010 (1990), to support their alter ego contention. The plaintiffs, Subway franchisees, sued DAI, SSS, and others, claiming, among other things, fraudulent misrepresentation, breach of contract, and violations of the Illinois Franchise Disclosure Act. 140 Ill.Dec. at 361, 549 N.E.2d at 1012. DAI sought to compel arbitration under the franchise agreements. *Id.* at 362, 549 N.E.2d at 1013. While that motion was pending, SSS sued to evict the plaintiffs from their Subway stores. *Id.* The court stated that SSS "had no existence apart from [DAI]", and, that "[i]f [SSS] was not [DAI's] alter ego, it was at least its agent." *Id.* at 365–66, 549 N.E.2d at 1016–17. It therefore held that, under Illinois law, SSS's filing suit constituted a waiver of DAI's right to compel arbitration. *Id.* at 366, 549 N.E.2d at 1017. But *Yates* offers little support for the debtors' position. As noted, the court did not find that SSS was DAI's alter ego; instead, it held only that DAI, through the possessory actions by its agent, SSS, had waived its right to compel arbitration.

*Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc.*, 61 Wash.App. 395, 811 P.2d 221 (1991), is of greater relevance to the issues before us. In *Norhawk*, DAI had entered into a franchise agreement with Cappiello. 811 P.2d at 222. SSS leased property and sublet it to Cappiello. *Id.* Norhawk subsequently purchased the property, and SSS's lease was assigned to it. *Id.* Cappiello defaulted on the sublease, and Norhawk obtained a judgment against SSS. *Id.* After unsuccessfully attempting to collect the judgment, Norhawk sought to collect from DAI, contending that DAI was the alter ego of SSS. It conceded that no fraud was committed, but contended that deliberate undercapitalization of SSS

The bankruptcy court acknowledged the "substantial interrelation" between the creditors, but found, on the basis of the evidence before it, that they were "viable, independent corporations with separate legal identities." That finding is not clearly erroneous.[15]

### 2.

■ Because the creditors are not the alter egos of DAI, the district court erred in considering DAI a party. The debtors assert that DAI was an indispensable party, and note that the creditors did not object when the debtors named it as a "counter-defendant" in various motions filed in the bankruptcy court. This contention is meritless. Bankruptcy Rule 1018 specifies that certain rules are applicable to all proceedings relating to a contested involuntary petition; Rule 7019, which incorporates Fed.R.Civ.P. 19 (joinder of persons needed for just adjudication) is not so specified. Therefore, it does not apply unless the court otherwise directs. *Id.* The record contains no such direction from the bankruptcy court.[16] Accordingly, the debtors' attempts to join DAI as a party were ineffective.

### 3.

■ The district court also erred in considering the disputes between DAI and Earl Sims as the basis for its conclusions that the debts are contingent and subject to bona fide disputes.

"A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981); *see also* 2 *Collier on Bankruptcy,* ¶ 303.08[11][a] (1993) ("[w]hen the duty to pay a claim does not rest upon the occurrence of a future event, the claim is not contingent"). Unpaid rent is not contingent as to liability. *Id.* Accordingly, the creditors' claims on the subleases and equipment leases are not contingent as to liability.

Although our court has not yet considered how to define a "bona fide dispute", we find guidance from the Third, Seventh, Eighth, and Tenth Circuits, which have all adopted an objective standard, based on the reason-

---

was an abuse of the corporate form. *Id.* at 223. Applying Washington law, the court held that substantial evidence supported the trial court's conclusion that DAI was not the alter ego of SSS. *Id.* at 222–24.

15. The district court's rejection of that finding was heavily influenced by its reliance on proffered deposition testimony, which the bankruptcy court had ruled inadmissible (depositions of DAI's president (owner of 50% of DAI, SEL, SSS, and SRI) and a DAI employee; offered primarily in support of debtors' contentions regarding DAI's withholding Earl Sims' development agent payments and allegedly applying them to past due rent and attorney's fees). Although the debtors did not specifically appeal that bankruptcy court ruling, they repeatedly relied on the proffered evidence before the district court, and continue to do so. And, although it appears that the district court granted the creditors' motion to strike any references to such evidence in the debtors' initial brief, it nevertheless relied on that evidence in its opinion.

The debtors attempt to defend the district court's action by characterizing the bankruptcy court's exclusion of the proffered evidence as "plain error". They also contend that the district court has inherent equitable power to supplement the record, relying on *Cabalceta v. Stan-*

*dard Fruit Co.,* 883 F.2d 1553 (11th Cir.1989); *Ross v. Kemp,* 785 F.2d 1467 (11th Cir.1986); and *Dickerson v. Alabama,* 667 F.2d 1364 (11th Cir.), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982). Those cases are inapposite. The record was supplemented in *Cabalceta,* because the court was considering subject matter jurisdiction. 883 F.2d at 1555. *Dickerson* and *Ross* both involved state habeas corpus claims, and the court cited "the unique powers that federal appellate judges have in the context of habeas corpus actions by virtue of 28 U.S.C. § 2254(a)." *Ross,* 785 F.2d at 1475; *Dickerson,* 667 F.2d at 1368 n. 7. None of those cases involved evidentiary rulings which the appellant failed to challenge on appeal.

In any event, assuming the bankruptcy court's evidentiary ruling was properly before the district court, such evidence was inadmissible in light of our holding that the alter ego theory does not apply. *See infra.*

16. The 1983 advisory committee's note states that, "[b]ecause of the special need for dispatch and expedition in the determination of the issues in an involuntary petition, ... [Rule 7019] will rarely be appropriate in a proceeding on a contested petition". Bankruptcy Rule 1018, 1983 advisory committee's note.

ing of *In re Lough,* 57 B.R. 993 (Bankr. E.D.Mich.1986). Under that objective standard, the bankruptcy court must "determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *In re Rimell,* 946 F.2d 1363, 1365 (8th Cir.1991) (citing *Matter of Busick,* 831 F.2d 745, 750 (7th Cir.1987), and *Bartmann v. Maverick Tube Corp.,* 853 F.2d 1540, 1544 (10th Cir.1988)), *cert. denied,* —— U.S. ——, 112 S.Ct. 2275, 119 L.Ed.2d 202 (1992); *see also B.D.W. Assoc. v. Busy Beaver Bldg. Centers, Inc.,* 865 F.2d 65, 66–67 (3d Cir.1989) (a bona fide dispute exists if there are " 'substantial' factual and legal questions raised by the debtor" bearing upon the debtor's liability). We adopt that objective standard, as well as the Eighth Circuit's methodology for applying it, which includes a clearly erroneous standard of review:

> [T]he petitioning creditor must establish a prima facie case that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a bona fide dispute does exist. Because the standard is objective, neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden. The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute. This does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists. Finally, because the determination as to whether a dispute is bona fide will often depend ... upon an assessment of witnesses' credibilities and other factual considerations, the bankruptcy court's determination in this regard is a factual finding that may be overturned on appeal only if it is clearly erroneous.

*Rimell,* 946 F.2d at 1365 (citations omitted).

The creditors submitted evidence of the debtors' defaults on the subleases and equipment leases for the four franchise locations, and thus met their burden of establishing a prima facie case that no bona fide dispute

exists. Earl Sims' dispute with DAI arose over the separate development agent issue. That dispute has nothing to do with the debtors' obligations under the equipment leases and subleases, and did not relieve them of their liability for unpaid rent. The debtors' contention that they were unable to make their payments on the subleases and equipment leases because DAI withheld money owed Earl Sims as a development agent amounts to nothing more than an attempt to explain why they failed to pay—it does not call into question the validity of their debts for unpaid rent due SEL, SRI, and SSS.

■ The debtors also contend that the debts are subject to bona fide disputes, because the creditors failed to mitigate their damages after the debtors abandoned a store in June 1988. Assuming, without deciding, that one or more of the creditors had an obligation to relet the premises, and that they failed to make reasonable efforts to do so, any such failure would serve only to reduce the amount of SRI's and SEL's claims with respect to that franchise; it would not constitute a substantial factual or legal question bearing on the debtors' liability under those leases. Moreover, any such failure to mitigate would be irrelevant with respect to the debts owed SRI, SEL, and SSS for the other three franchises. Because the debtors failed to meet their burden of presenting evidence demonstrating the existence of a bona fide dispute, the bankruptcy court did not clearly err in finding that the debts are not subject to such disputes.

### 4.

The creditors contend that the district court erred in stating that the debtors were current on their obligations under all of the leases "until about August or September of 1988, when DAI began withholding [Earl Sims'] salary as a development agent." In light of the undisputed evidence that the debtors abandoned a store in June 1988, and defaulted on the sublease and equipment lease for that franchise, it is clear that the district court's statement is erroneous. The debtors concede as much, but contend that any error was harmless.

Because the debtors were in default on their obligations as of November 1988, when the original petition was filed, it is irrelevant whether the defaults occurred in June or September or October 1988, at least for purposes of the "generally not paying" determination. *E.g., In re West Side Community Hospital, Inc.,* 112 B.R. 243, 256 (Bankr. N.D.Ill.1990) ("It is fundamental that the determination of whether the debtor is generally paying such debtor's debts as such debts become due must be made as of the date of filing the petition".). However, the district court's error with respect to the timing of the defaults reflects a mistaken belief that the defaults were caused by the dispute between DAI and Earl Sims and DAI's withholding his development agent payments. Inasmuch as DAI did not begin withholding those payments until August 1988, it is clear that its actions did not cause the June 1988 defaults. The district court's error concerning the cause of the defaults contributed to its conclusion that the petitions were filed in bad faith. Accordingly, we cannot agree that this error was harmless.

### 5.

The district court's reversal of the bankruptcy court's denial of the debtors' motions to dismiss for bad faith filing was based on its erroneous conclusion that the creditors are the alter egos of DAI, and its further erroneous conclusion that Earl Sims' dispute with DAI caused the creditors' debts to be contingent and subject to bona fide disputes. Because the bankruptcy court correctly found that the creditors are not the alter egos of DAI, and correctly ruled that Earl Sims' dispute with DAI was irrelevant to determining whether the creditors satisfied the requirements of § 303, there is no basis for the district court's ruling on bad faith.

■ The debtors have asserted alternative grounds to support that ruling. First, as discussed earlier, they contend that bad faith is demonstrated by the fact that, prior to filing the petitions, the creditors had filed suit against them in state court, and they had asserted counterclaims against the creditors. Contrary to the debtors' assertions, their mere filing of such counterclaims against the creditors is insufficient to demonstrate the existence of a bona fide dispute, and thus does not support a determination that the creditors filed in bad faith.

Next, the debtors assert that they were current in their obligations, because they had paid their virile share of their obligations as partners under the various leases and subleases. We interpret their argument as a contention that the petitions were filed in bad faith, because their total debts did not exceed $5,000, as required by § 303(b)(1), or because the creditors failed to prove that they were "generally not paying" their debts. The evidence belies these assertions and overwhelmingly supports the bankruptcy court's findings that the aggregate total of their debts exceeded $5,000, and that the debtors were "generally not paying" them.

Finally, the debtors contend that the creditors' counsel "was a live exhibit of bad faith", charging that he made false statements and committed fraud upon the court. They also contend that a DAI employee committed perjury when testifying in bankruptcy court. As we have previously noted, these allegations are wholly unsupported by the record. In any event, they offer no support for finding that the petitions were filed in bad faith.

■ The creditors were qualified to file the involuntary petitions pursuant to § 303(b)(1), and the bankruptcy court correctly found that the debtors were not generally paying their debts, pursuant to § 303(h). There is no evidence that the filing of the petitions was "motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s]". *In re West Side Community Hospital,* 112 B.R. at 258. Furthermore, there was undisputed evidence that the creditors conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011. Accordingly, the bankruptcy court properly granted involuntary relief; and the district court erred in ordering that the petitions be dismissed for bad faith filing.

### III.

For the foregoing reasons, the judgments of the district court are REVERSED. The

cases are REMANDED to the district court with instructions to reinstate the judgments of the bankruptcy court, and to remand the cases to that court for further proceedings.

REVERSED AND REMANDED.